CHEMICAL WASTE MANAGEMENT, INC. *v.* HUNT,
GOVERNOR OF ALABAMA, ET AL.

No. 91–471.   Argued April 21, 1992—Decided June 1, 1992

WHITE, J., delivered the opinion of the Court, in which BLACKMUN, STEVENS, O'CONNOR, SCALIA, KENNEDY, SOUTER, and THOMAS, JJ., joined. REHNQUIST, C. J., filed a dissenting opinion, *post*, p. 349.

*Andrew J. Pincus* argued the cause for petitioner. With him on the briefs were *Kenneth S. Geller, Evan M. Tager, Fournier J. Gale III, H. Thomas Wells, Jr., James T. Banks,* and *John T. Van Gessel.*

*Bert S. Nettles* argued the cause for respondents. With him on the brief were *William D. Little,* Assistant Attorney General of Alabama, *William D. Coleman, Jim B. Grant, Jr., J. Wade Hope, Alton B. Parker, Jr., J. Mark Hart,* and *Mark D. Hess.*

*Edwin S. Kneedler* argued the cause for the United States as *amicus curiae* urging reversal. On the brief were *Solicitor General Starr, Acting Assistant Attorney General Hartman, Deputy Solicitor General Wallace, Harriet S. Shapiro, Peter R. Steenland, Jr., Anne S. Almy, Louise F. Milkman,* and *Gerald H. Yamada.**

JUSTICE WHITE delivered the opinion of the Court.

Alabama imposes a hazardous waste disposal fee on hazardous wastes generated outside the State and disposed of at a commercial facility in Alabama. The fee does not apply to such waste having a source in Alabama. The Alabama

---

*Briefs of *amici curiae* urging reversal were filed for American Trucking Associations, Inc., by *Daniel R. Barney, Robert Digges, Jr.,* and *Walter Hellerstein;* and for the Hazardous Waste Treatment Council et al. by *Stuart H. Newberger, Ridgway M. Hall, Jr., Clifton S. Elgarten, David Case,* and *Bruce Parker.*

Briefs of *amici curiae* urging affirmance were filed for the State of New York by *Robert Abrams,* Attorney General, *Jerry Boone,* Solicitor General, and *David A. Munro,* Assistant Attorney General; for the State of South Carolina et al. by *T. Travis Medlock,* Attorney General of South Carolina, *Edwin E. Evans,* Chief Deputy Attorney General, *James Patrick Hudson,* Deputy Attorney General, *Kenneth P. Woodington,* Senior Assistant Attorney General, *Treva G. Ashworth,* Senior Assistant Attorney General, *Walton J. McLeod III, Jacquelyn S. Dickman, Samuel L. Finklea III, Charles F. Lettow,* and *Matthew D. Slater, Robert T. Stephen,* Attorney General of Kansas, *Paul Van Dam,* Attorney General of Utah, and *Richard P. Ieyoub,* Attorney General of Louisiana; for the National Governors' Association et al. by *Richard Ruda* and *Michael G. Dzialo;* and for the State of Ohio et al. by *Lee Fisher,* Attorney General of Ohio, *Mary Kay Smith,* Assistant Attorney General, and *Nancy J. Miller, Chris Gorman,* Attorney General of Kentucky, and *Stan Cox,* Assistant Attorney General, *Linley E. Pearson,* Attorney General of Indiana, *Robert T. Stephan,* Attorney General of Kansas, *Richard P. Ieyoub,* Attorney General of Louisiana, *Frank J. Kelley,* Attorney General of Michigan, *Tom Udall,* Attorney General of New Mexico, *Mark W. Barnett,* Attorney General of South Dakota, *Paul Van Dam,* Attorney General of Utah, *Joseph B. Meyer,* Attorney General of Wyoming, and *Charles W. Burson,* Attorney General of Tennessee.

Supreme Court held that this differential treatment does not violate the Commerce Clause. We reverse.

## I

Petitioner, Chemical Waste Management, Inc., a Delaware corporation with its principal place of business in Oak Brook, Illinois, owns and operates one of the Nation's oldest commercial hazardous waste land disposal facilities, located in Emelle, Alabama. Opened in 1977 and acquired by petitioner in 1978, the Emelle facility is a hazardous waste treatment, storage, and disposal facility operating pursuant to permits issued by the Environmental Protection Agency (EPA) under the Resource Conservation and Recovery Act of 1976 (RCRA), 90 Stat. 2795, as amended, 42 U. S. C. § 6901 *et seq.*, and the Toxic Substances Control Act, 90 Stat. 2003, as amended, 15 U. S. C. § 2601 *et seq.* (1988 ed. and Supp. II), and by the State of Alabama under Ala. Code § 22–30–12(i) (1990). Alabama is 1 of only 16 States that have commercial hazardous waste landfills, and the Emelle facility is the largest of the 21 landfills of this kind located in these 16 States. Brief for National Governors' Assn. et al. as *Amici Curiae* 3, citing E. Smith, EI Digest 26–27 (Mar. 1992).

The parties do not dispute that the wastes and substances being landfilled at the Emelle facility "include substances that are inherently dangerous to human health and safety and to the environment. Such waste consists of ignitable, corrosive, toxic and reactive wastes which contain poisonous and cancer causing chemicals and which can cause birth defects, genetic damage, blindness, crippling and death."[1]    584

---

[1] As used in RCRA, 42 U. S. C. § 6903(5), the term "hazardous waste" means:

"a solid waste, or combination of solid wastes, which because of its quantity, concentration, or physical, chemical, or infectious characteristics may—

"(A) cause, or significantly contribute to an increase in mortality or an increase in serious irreversible, or incapacitating reversible, illness; or

So. 2d 1367, 1373 (Ala. 1991). Increasing amounts of out-of-state hazardous wastes are shipped to the Emelle facility for permanent storage each year. From 1985 through 1989, the tonnage of hazardous waste received per year has more than doubled, increasing from 341,000 tons in 1985 to 788,000 tons by 1989. Of this, up to 90% of the tonnage permanently buried each year is shipped in from other States.

Against this backdrop Alabama enacted Act No. 90–326 (Act). Ala. Code §§ 22–30B–1 to 22–30B–18 (1990 and Supp. 1991). Among other provisions, the Act includes a "cap" that generally limits the amount of hazardous wastes or substances[2] that may be disposed of in any 1-year period, and the amount of hazardous waste disposed of during the first year under the Act's new fees becomes the permanent ceiling in subsequent years. Ala. Code § 22–30B–2.3 (1990). The cap applies to commercial facilities that dispose of over 100,000 tons of hazardous wastes or substances per year, but only the Emelle facility, as the only commercial facility operating within Alabama, meets this description. The Act also imposes a "base fee" of $25.60 per ton on all hazardous wastes and substances disposed of at commercial facilities, to be paid by the operator of the facility. Ala. Code § 22–30B–2(a) (Supp. 1991). Finally, the Act imposes the "additional fee" at issue here, which states in full:

> "For waste and substances which are generated outside of Alabama and disposed of at a commercial site for

---

"(B) pose a substantial present or potential hazard to human health or the environment when improperly treated, stored, transported, or disposed of, or otherwise managed."

RCRA directs the EPA to establish a comprehensive "cradle to grave" system regulating the generation, transport, storage, treatment, and disposal of hazardous wastes, §§ 6921–6939b, which includes identification and listing of hazardous wastes, § 6921. At present, there are more than 500 such listed wastes. See 40 CFR pt. 261, subpt. D (1991).

[2] "Hazardous substance(s)" and "hazardous waste(s)" are defined terms in the Act, §§ 22–30B–1(3) and 22–30B–1(4), but these definitions largely parallel the meanings given under federal law.

the disposal of hazardous waste or hazardous substances in Alabama, an additional fee shall be levied at the rate of $72.00 per ton." § 22–30B–2(b).

Petitioner filed suit in state court requesting declaratory relief against respondents and seeking to enjoin enforcement of the Act. In addition to state-law claims, petitioner contended that the Act violated the Commerce, Due Process, and Equal Protection Clauses of the United States Constitution, and was pre-empted by various federal statutes. The trial court declared the base fee and the cap provisions of the Act to be valid and constitutional; but, finding the only basis for the additional fee to be the origin of the waste, the trial court declared it to be in violation of the Commerce Clause. App. to Pet. for Cert. 83a–88a. Both sides appealed. The Alabama Supreme Court affirmed the rulings concerning the base fee and cap provisions but reversed the decision regarding the additional fee. The court held that the fee at issue advanced legitimate local purposes that could not be adequately served by reasonable nondiscriminatory alternatives and was therefore valid under the Commerce Clause. 584 So. 2d, at 1390.

Chemical Waste Management, Inc., petitioned for writ of certiorari, challenging all aspects of the Act. Because of the importance of the federal question and the likelihood that it had been decided in a way conflicting with applicable decisions of this Court, this Court's Rule 10.1(c), we granted certiorari limited to petitioner's Commerce Clause challenge to the additional fee. 502 U. S. 1070 (1992). We now reverse.

## II

No State may attempt to isolate itself from a problem common to the several States by raising barriers to the free flow

of interstate trade.[3]  Today, in *Fort Gratiot Sanitary Land-fill, Inc.* v. *Michigan Dept. of Natural Resources, post,* p. 353, we have also considered a Commerce Clause challenge to a Michigan law prohibiting private landfill operators from accepting solid waste originating outside the county in which their facilities operate.  In striking down that law, we adhered to our decision in *Philadelphia* v. *New Jersey,* 437 U. S. 617 (1978), where we found New Jersey's prohibition of solid waste from outside that State to amount to economic protectionism barred by the Commerce Clause:

> " '[T]he evil of protectionism can reside in legislative means as well as legislative ends.  Thus, it does not matter whether the ultimate aim of ch. 363 is to reduce the waste disposal costs of New Jersey residents or to save remaining open lands from pollution, for we assume New Jersey has every right to protect its residents'

---

[3] The Alabama Supreme Court assumed that the disposal of hazardous waste constituted an article of commerce, and the State does not explicitly argue here to the contrary.  In *Fort Gratiot Sanitary Landfill, Inc.* v. *Michigan Dept. of Natural Resources, post,* at 359, we have reaffirmed the idea that "[s]olid waste, even if it has no value, is an article of commerce."  As stated in *Philadelphia* v. *New Jersey,* 437 U. S. 617, 622–623 (1978): "All objects of interstate trade merit Commerce Clause protection; none is excluded by definition at the outset. . . . Just as Congress has power to regulate the interstate movement of these wastes, States are not free from constitutional scrutiny when they restrict that movement." The definition of "hazardous waste" makes clear that it is simply a grade of solid waste, albeit one of particularly noxious and dangerous propensities, see n. 1, *supra,* but whether the business arrangements between out-of-state generators of hazardous waste and the Alabama operator of a hazardous waste landfill are viewed as "sales" of hazardous waste or "purchases" of transportation and disposal services, "the commercial transactions unquestionably have an interstate character.  The Commerce Clause thus imposes some constraints on [Alabama's] ability to regulate these transactions." *Fort Gratiot Sanitary Landfill, post,* at 359.  See *National Solid Wastes Management Assn.* v. *Alabama Dept. of Environmental Mgmt.,* 910 F. 2d 713, 718–719 (CA11 1990), modified, 924 F. 2d 1001, cert. denied, 501 U. S. 1206 (1991).

pocketbooks as well as their environment. And it may be assumed as well that New Jersey may pursue those ends by slowing the flow of *all* waste into the State's remaining landfills, even though interstate commerce may incidentally be affected. But whatever New Jersey's ultimate purpose, it may not be accompanied by discriminating against articles of commerce coming from outside the State unless there is some reason, apart from their origin, to treat them differently. Both on its face and in its plain effect, ch. 363 violates this principle of nondiscrimination.

" 'The Court has consistently found parochial legislation of this kind to be constitutionally invalid, whether the ultimate aim of the legislation was to assure a steady supply of milk by erecting barriers to allegedly ruinous outside competition, *Baldwin* v. *G. A. F. Seelig, Inc.*, 294 U. S. [511,] 522–524 [(1935)]; or to create jobs by keeping industry within the State, *Foster-Fountain Packing Co.* v. *Haydel*, 278 U. S. 1, 10 [(1928)]; *Johnson* v. *Haydel*, 278 U. S. 16 [(1928)]; *Toomer* v. *Witsell*, 334 U. S. [385,] 403–404 [(1948)]; or to preserve the State's financial resources from depletion by fencing out indigent immigrants, *Edwards* v. *California*, 314 U. S. 160, 173–174 [(1941)].' " *Fort Gratiot Sanitary Landfill, post*, at 360 (quoting *Philadelphia* v. *New Jersey, supra*, at 626–627).

To this list may be added cases striking down a tax discriminating against interstate commerce, even where such tax was designed to encourage the use of ethanol and thereby reduce harmful exhaust emissions, *New Energy Co. of Ind.* v. *Limbach*, 486 U. S. 269, 279 (1988), or to support inspection of foreign cement to ensure structural integrity, *Hale* v. *Bimco Trading, Inc.,* 306 U. S. 375, 379–380 (1939). For in all of these cases, "a presumably legitimate goal was sought to be achieved by the illegitimate means of isolating the

State from the national economy." *Philadelphia* v. *New Jersey, supra,* at 627.

The Act's additional fee facially discriminates against hazardous waste generated in States other than Alabama, and the Act overall has plainly discouraged the full operation of petitioner's Emelle facility.[4]  Such burdensome taxes imposed on interstate commerce alone are generally forbidden: "[A] State may not tax a transaction or incident more heavily when it crosses state lines than when it occurs entirely within the State." *Armco Inc.* v. *Hardesty,* 467 U. S. 638, 642 (1984); see also *Walling* v. *Michigan,* 116 U. S. 446, 455 (1886); *Guy* v. *Baltimore,* 100 U. S. 434, 439 (1880).  Once a state tax is found to discriminate against out-of-state commerce, it is typically struck down without further inquiry. See, *e. g., Westinghouse Electric Corp.* v. *Tully,* 466 U. S. 388, 406–407 (1984); *Maryland* v. *Louisiana,* 451 U. S. 725, 759–760 (1981); *Boston Stock Exchange* v. *State Tax Comm'n,* 429 U. S. 318, 336–337 (1977).

The State, however, argues that the additional fee imposed on out-of-state hazardous waste serves legitimate local purposes related to its citizens' health and safety.  Because the additional fee discriminates both on its face and in practical effect, the burden falls on the State "to justify it both in terms of the local benefits flowing from the statute and the unavailability of nondiscriminatory alternatives adequate to preserve the local interests at stake." *Hunt* v. *Washington State Apple Advertising Comm'n,* 432 U. S. 333, 353 (1977); see also *Fort Gratiot Sanitary Landfill, post,* at 359; *New Energy Co., supra,* at 278–279.  "At a minimum such facial discrimination invokes the strictest scrutiny of any purported legitimate local purpose and of the absence of nondis-

---

[4] The Act went into effect July 15, 1990.  The volume of hazardous waste buried at the Emelle facility fell dramatically from 791,000 tons in 1989 to 290,000 tons in 1991.

criminatory alternatives." *Hughes* v. *Oklahoma*, 441 U. S. 322, 337 (1979).[5]

The State's argument here does not significantly differ from the Alabama Supreme Court's conclusions on the legitimate local purposes of the additional fee imposed, which were:

> "The Additional Fee serves these legitimate local purposes that cannot be adequately served by reasonable nondiscriminatory alternatives: (1) protection of the health and safety of the citizens of Alabama from toxic substances; (2) conservation of the environment and the state's natural resources; (3) provision for compensatory revenue for the costs and burdens that out-of-state waste generators impose by dumping their hazardous waste in Alabama; (4) reduction of the overall flow of wastes traveling on the state's highways, which flow creates a great risk to the health and safety of the state's citizens." 584 So. 2d, at 1389.

These may all be legitimate local interests, and petitioner has not attacked them. But only rhetoric, and not explanation, emerges as to why Alabama targets *only* interstate hazardous waste to meet these goals. As found by the trial court, "[a]lthough the Legislature imposed an additional fee of $72.00 per ton on waste generated outside Alabama, there

---

[5] To some extent the State attempts to avail itself of the more flexible approach outlined in, *e. g., Brown-Forman Distillers Corp.* v. *New York State Liquor Authority*, 476 U. S. 573, 579 (1986), and *Pike* v. *Bruce Church, Inc.*, 397 U. S. 137, 142 (1970), but this lesser scrutiny is only available "where other legislative objectives are credibly advanced *and* there is *no* patent discrimination against interstate trade." *Philadelphia* v. *New Jersey*, 437 U. S., at 624 (emphasis added). We find no room here to say that the Act presents "effects upon interstate commerce that are only incidental," *ibid.*, for the Act's additional·fee on its face targets *only* out-of-state hazardous waste. While no "clear line" separates close cases on which scrutiny should apply, "this is not a close case." *Wyoming* v. *Oklahoma*, 502 U. S. 437, 455, n. 12 (1992).

is absolutely no evidence before this Court that waste generated outside Alabama is more dangerous than waste generated in Alabama. The Court finds under the facts of this case that the only basis for the additional fee is the origin of the waste." App. to Pet. for Cert. 83a–84a. In the face of such findings, invalidity under the Commerce Clause necessarily follows, for "whatever [Alabama's] ultimate purpose, it may not be accomplished by discriminating against articles of commerce coming from outside the State unless there is some reason, apart from their origin, to treat them differently." *Philadelphia* v. *New Jersey*, 437 U. S., at 626–627; see *New Energy Co.*, 486 U. S., at 279–280. The burden is on the State to show that "the *discrimination* is demonstrably justified by a valid factor unrelated to economic protectionism,"[6] *Wyoming* v. *Oklahoma*, 502 U. S. 437, 454 (1992) (emphasis added), and it has not carried this burden. Cf. *Fort Gratiot Sanitary Landfill, post*, at 361.

Ultimately, the State's concern focuses on the volume of the waste entering the Emelle facility.[7] Less discriminatory

---

[6] The Alabama Supreme Court found no "economic protectionism" here, and thus purported to distinguish *Philadelphia* v. *New Jersey*, based on its conclusions that the legislature was motivated by public health and environmental concerns. 584 So. 2d 1367, 1388–1389 (1991). This narrow focus on the intended consequence of the additional fee does not conform to our precedents, for "[a] finding that state legislation constitutes 'economic protectionism' may be made on the basis of either discriminatory purpose, see *Hunt* v. *Washington Apple Advertising Comm'n*, 432 U. S. 333, 352–353 (1977), or discriminatory effect, see *Philadelphia* v. *New Jersey, supra.*" *Bacchus Imports, Ltd.* v. *Dias*, 468 U. S. 263, 270 (1984). The "virtually *per se* rule of invalidity," *Philadelphia* v. *New Jersey, supra*, at 624, applies "not only to laws motivated solely by a desire to protect local industries from out-of-state competition, but also to laws that respond to legitimate local concerns by discriminating arbitrarily against interstate trade." *Maine* v. *Taylor*, 477 U. S. 131, 148, n. 19 (1986).

[7] "The risk created by hazardous waste and other similarly dangerous waste materials is proportional to the *volume* of such waste materials present, and may be controlled by controlling that volume." Brief for Respondents 38 (citation omitted; emphasis in original).

alternatives, however, are available to alleviate this concern, not the least of which are a generally applicable per-ton additional fee on *all* hazardous waste disposed of within Alabama, cf. *Commonwealth Edison Co.* v. *Montana,* 453 U. S. 609, 619 (1981), or a per-mile tax on *all* vehicles transporting hazardous waste across Alabama roads, cf. *American Trucking Assns., Inc.* v. *Scheiner,* 483 U. S. 266, 286 (1987), or an evenhanded cap on the total tonnage landfilled at Emelle, see *Philadelphia* v. *New Jersey, supra,* at 626, which would curtail volume from all sources.[8]  To the extent Alabama's concern touches environmental conservation and the health and safety of its citizens, such concern does not vary with the point of origin of the waste, and it remains within the State's power to monitor and regulate more closely the transporta-

---

[8] The State asserts: "An equal fee, at any level, would necessarily fail to serve the State's purpose.  An equal fee high enough to provide any significant deterrent to the importation of hazardous waste for landfilling in the State would amount to an attempt by the State to avoid its responsibility to deal with its own problems, by tending to cause in-state waste to be exported for disposal.  An equal fee not so high as to amount to an attempt to force Alabama's own problems to be borne by citizens of other states would fail to provide any significant reduction in the enormous volumes of imported hazardous waste being dumped in the State.  At the point where an equal fee would become effective to serve the State's purpose in protecting public health and the environment from uncontrolled volumes of imported waste, that equal fee would also become an avoidance of the State's responsibility to deal with its own waste problems." *Id.,* at 46.  These assertions are without record support and in any event do not suffice to validate plain discrimination against interstate commerce.  See *New Energy Co. of Ind.* v. *Limbach,* 486 U. S. 269, 280 (1988); *Hale* v. *Bimco Trading, Inc.,* 306 U. S. 375, 380 (1939): "That no Florida cement needs any inspection while all foreign cement requires inspection at a cost of fifteen cents per hundredweight is too violent an assumption to justify the discrimination here disclosed."  The additional fee is certainly not a "'last ditch' attempt" to meet Alabama's expressed purposes "after nondiscriminatory alternatives have proved unfeasible.  It is rather a choice of the most discriminatory [tax] even though nondiscriminatory alternatives would seem likely to fulfill the State's purported legitimate local purpose more effectively." *Hughes* v. *Oklahoma,* 441 U. S. 322, 338 (1979).

tion and disposal of *all* hazardous waste within its borders. Even with the possible future financial and environmental risks to be borne by Alabama, such risks likewise do not vary with the waste's State of origin in a way allowing foreign, but not local, waste to be burdened.[9]  In sum, we find the additional fee to be "an obvious effort to saddle those outside the State" with most of the burden of slowing the flow of waste into the Emelle facility.  *Philadelphia* v. *New Jersey*, 437 U. S., at 629.  "That legislative effort is clearly impermissible under the Commerce Clause of the Constitution."  *Ibid.*

Our decisions regarding quarantine laws do not counsel a different conclusion.[10]  The Act's additional fee may not legitimately be deemed a quarantine law because Alabama permits both the generation and landfilling of hazardous

---

[9] The State presents no argument here, as it did below, that the additional fee makes out-of-state generators pay their "fair share" of the costs of Alabama waste disposal facilities, or that the additional fee is justified as a "compensatory tax."  The trial court rejected these arguments, App. to Pet. for Cert. 88a, n. 6., finding the former foreclosed by *American Trucking Assns., Inc.* v. *Scheiner*, 483 U. S. 266, 287–289 (1987), and the latter to be factually unsupported by a requisite "substantially equivalent" tax imposed solely on in-state waste, as required by, *e. g., Tyler Pipe Industries, Inc.* v. *Washington State Dept. of Revenue*, 483 U. S. 232, 242–244 (1987).  Various *amici* assert that the discrimination patent in the Act's additional fee is consistent with congressional authorization.  We pretermit this issue, for it was not the basis for the decision below and has not been briefed or argued by the parties here.

[10] The State collects and refers to the following decisions, *inter alia,* as "quarantine cases": *Clason* v. *Indiana*, 306 U. S. 439 (1939); *Mintz* v. *Baldwin*, 289 U. S. 346 (1933); *Oregon-Washington Railroad & Navigation Co.* v. *Washington*, 270 U. S. 87 (1926); *Sligh* v. *Kirkwood*, 237 U. S. 52 (1915); *Asbell* v. *Kansas*, 209 U. S. 251 (1908); *Reid* v. *Colorado*, 187 U. S. 137 (1902); *Compagnie Francaise de Navigation a Vapeur* v. *Louisiana Bd. of Health*, 186 U. S. 380 (1902); *Smith* v. *St. Louis & Southwestern R. Co.*, 181 U. S. 248 (1901); *Rasmussen* v. *Idaho*, 181 U. S. 198 (1901); *Missouri, K. & T. R. Co.* v. *Haber*, 169 U. S. 613 (1898); *Bowman* v. *Chicago & Northwestern R. Co.*, 125 U. S. 465 (1888); *Railroad Co.* v. *Husen*, 95 U. S. 465 (1878).

waste within its borders and the importation of still more hazardous waste subject to payment of the additional fee. In any event, while it is true that certain quarantine laws have not been considered forbidden protectionist measures, even though directed against out-of-state commerce, those laws "did not discriminate against interstate commerce as such, but simply prevented traffic in noxious articles, whatever their origin." *Philadelphia* v. *New Jersey, supra,* at 629.[11] As the Court stated in *Guy* v. *Baltimore,* 100 U. S., at 443:

> "In the exercise of its police powers, a State may exclude from its territory, or prohibit the sale therein of any articles which, in its judgment, fairly exercised, are prejudicial to the health or which would endanger the lives or property of its people. But if the State, under the guise of exerting its police powers, should make such exclusion or prohibition applicable solely to articles, of that kind, that may be produced or manufactured in other States, the courts would find no difficulty in holding such legislation to be in conflict with the Constitution of the United States."

See also *Reid* v. *Colorado,* 187 U. S. 137, 151 (1902); *Railroad Co.* v. *Husen,* 95 U. S. 465, 472 (1878).

---

[11] "The hostility is to the thing itself, not to merely interstate shipments of the thing; and an undiscriminating hostility is at least nondiscriminatory. But that is not the case here. The State of Illinois is quite willing to allow the storage and even the shipment for storage of spent nuclear fuel in Illinois, provided only that its origin is intrastate." *Illinois* v. *General Elec. Co.,* 683 F. 2d 206, 214 (CA7 1982), cert. denied, 461 U. S. 913 (1983); cf. *Oregon-Washington Co.* v. *Washington, supra,* at 96: Inspection followed by quarantine of hay from fields infested with weevils is "a real quarantine law, and not a mere inhibition against importation of alfalfa from a large part of the country without regard to the condition which might make its importation dangerous."

The law struck down in *Philadelphia* v. *New Jersey* left local waste untouched, although no basis existed by which to distinguish interstate waste. But "[i]f one is inherently harmful, so is the other. Yet New Jersey has banned the former while leaving its landfill sites open to the latter." 437 U. S., at 629. Here, the additional fee applies only to interstate hazardous waste, but at all points from its entrance into Alabama until it is landfilled at the Emelle facility, every concern related to quarantine applies perforce to local hazardous waste, which pays no additional fee. For this reason, the additional fee does not survive the appropriate scrutiny applicable to discriminations against interstate commerce.

*Maine* v. *Taylor*, 477 U. S. 131 (1986), provides no additional justification. Maine there demonstrated that the out-of-state baitfish were subject to parasites foreign to in-state baitfish. This difference posed a threat to the State's natural resources, and absent a less discriminatory means of protecting the environment—and none was available—the importation of baitfish could properly be banned. *Id.*, at 140. To the contrary, the record establishes that the hazardous waste at issue in this case is the same regardless of its point of origin. As noted in *Fort Gratiot Sanitary Landfill*, "our conclusion would be different if the imported waste raised health or other concerns not presented by [Alabama] waste." *Post*, at 367. Because no unique threat is posed, and because adequate means other than overt discrimination meet Alabama's concerns, *Maine* v. *Taylor* provides the State no respite.

## III

The decision of the Alabama Supreme Court is reversed, and the cause is remanded for proceedings not inconsistent with this opinion, including consideration of the appropriate relief to petitioner. See *McKesson Corp.* v. *Division of Alcoholic Beverages and Tobacco, Fla. Dept. of Business Regu-*

*lations,* 496 U. S. 18, 31 (1990); *Tyler Pipe Industries, Inc.* v. *Washington State Dept. of Revenue,* 483 U. S. 232, 251– 253 (1987).

*So ordered.*

CHIEF JUSTICE REHNQUIST, dissenting.

I have already had occasion to set out my view that States need not ban all waste disposal as a precondition to protecting themselves from hazardous or noxious materials brought across the State's borders. See *Philadelphia* v. *New Jersey,* 437 U. S. 617, 629 (1978) (REHNQUIST, J., dissenting). In a case also decided today, I express my further view that States may take actions legitimately directed at the preservation of the State's natural resources, even if those actions incidentally work to disadvantage some out-of-state waste generators. See *Fort Gratiot Sanitary Landfill, Inc.* v. *Michigan Dept. of Natural Resources, post,* p. 368 (REHNQUIST, C. J., dissenting). I dissent today, largely for the reasons I have set out in those two cases. Several additional comments that pertain specifically to this case, though, are in order.

Taxes are a recognized and effective means for discouraging the consumption of scarce commodities—in this case the safe environment that attends appropriate disposal of hazardous wastes. Cf. 26 U. S. C. §§ 4681, 4682 (1988 ed., Supp. III) (tax on ozone-depleting chemicals); 26 U. S. C. § 4064 (gas guzzler excise tax). I therefore see nothing unconstitutional in Alabama's use of a tax to discourage the export of this commodity to other States, when the commodity is a public good that Alabama has helped to produce. Cf. *Fort Gratiot, post,* at 372 (REHNQUIST, C. J., dissenting). Nor do I see any significance in the fact that Alabama has chosen to adopt a differential tax rather than an outright ban. Nothing in the Commerce Clause requires Alabama to adopt an "all or nothing" regulatory approach to noxious materials coming

from without the State. See *Mintz* v. *Baldwin,* 289 U. S. 346 (1933) (upholding State's *partial* ban on cattle importation).

In short, the Court continues to err by its failure to recognize that waste—in this case admittedly *hazardous* waste—presents risks to the public health and environment that a State may legitimately wish to avoid, and that the State may pursue such an objective by means less Draconian than an outright ban. Under force of this Court's precedent, though, it increasingly appears that the only avenue by which a State may avoid the importation of hazardous wastes is to ban such waste disposal altogether, regardless of the waste's source of origin. I see little logic in creating, and nothing in the Commerce Clause that requires us to create, such perverse regulatory incentives. The Court errs in substantial measure because it refuses to acknowledge that a safe and attractive environment is the commodity really at issue in cases such as this. See *Fort Gratiot, post,* at 369, n. (REHNQUIST, C. J., dissenting). The result is that the Court today gets it exactly backward when it suggests that Alabama is attempting to "isolate itself from a problem common to the several States." *Ante,* at 339. To the contrary, it is the 34 States that have no hazardous waste facility whatsoever, not to mention the remaining 15 States with facilities all smaller than Emelle, that have isolated themselves.

There is some solace to be taken in the Court's conclusion, *ante,* at 344–345, that Alabama may impose a substantial fee on the disposal of all hazardous waste, or a per-mile fee on all vehicles transporting such waste, or a cap on total disposals at the Emelle facility. None of these approaches provide Alabama the ability to tailor its regulations in a way that the State will be solving only that portion of the problem that it has created. See *Fort Gratiot, post,* at 370–371 (REHNQUIST, C. J., dissenting). But they do at least give Alabama some mechanisms for requiring waste-generating States to compensate Alabama for the risks the Court declares Alabama must run.

Of course, the costs of any of the proposals that the Court today approves will be less than fairly apportioned. For example, should Alabama adopt a flat transportation or disposal tax, Alabama citizens will be forced to pay a disposal tax equal to that faced by dumpers from outside the State. As the Court acknowledges, such taxes are a permissible effort to recoup compensation for the risks imposed on the State. Yet Alabama's general tax revenues presumably already support the State's various inspection and regulatory efforts designed to ensure the Emelle facility's safe operation. Thus, Alabamians will be made to pay twice, once through general taxation and a second time through a specific disposal fee. Permitting differential taxation would, in part, do no more than recognize that, having been made to bear all the risks from such hazardous waste sites, Alabama should not in addition be made to pay *more* than others in supporting activities that will help to minimize the risk.

Other mechanisms also appear open to Alabama to achieve results similar to those that are seemingly foreclosed today. There seems to be nothing, for example, that would prevent Alabama from providing subsidies or other tax breaks to domestic industries that generate hazardous wastes. Or Alabama may, under the market participant doctrine, open its own facility catering only to Alabama customers. See, *e. g.*, *White* v. *Massachusetts Council of Constr. Employers, Inc.*, 460 U. S. 204, 206–208 (1983); *Reeves, Inc.* v. *Stake*, 447 U. S. 429, 436–437 (1980); *Hughes* v. *Alexandria Scrap Corp.*, 426 U. S. 794, 810 (1976). But certainly we have lost our way when we require States to perform such gymnastics, when such performances will in turn produce little difference in ultimate effects. In sum, the only sure byproduct of today's decision is additional litigation. Assuming that those States that are currently the targets for large volumes of hazardous waste do not simply ban hazardous waste sites altogether, they will undoubtedly continue to search for a way to limit their risk from sites in operation. And each new arrange-

ment will generate a new legal challenge, one that will work to the principal advantage only of those States that refuse to contribute to a solution.

For the foregoing reasons, I respectfully dissent.