**NATIONAL SOLID WASTE MANAGEMENT ASSOC.,** et al. Plaintiffs

v.

**PINE BELT SOLID WASTE MANAGEMENT AUTHORITY,** et al. Defendants

**No. CIV.A.2:02 CV 723 GU.**

United States District Court, S.D. Mississippi, Hattiesburg Division.

April 23, 2003.

John G. Corlew, Virginia T. Munford, Watkins & Eager, Jackson, Harry R. Allen, David W. Crane, Thomas E. Vaughn, Allen, Vaughn, Cobb & Hood, Gulfport, T. Michael Reed, T. Michael Reed, Attorney, Hattiesburg, for National Solid Wastes Management Association, BFI Waste Systems, BFI Waste Systems of Mississippi, LLC, Waste Management of Mississippi, Inc., Pine Belt Waste Systems, LLC, plaintiffs.

Norman G. Hortman, Jr., Hortman, Harlow, Martindale, Bassi & Robinson, PLLC, Laurel, Ricky Lee Boggan, Office of the Attorney General, Jackson, Moran M. Pope, III, Pope & Pope, Hattiesburg, Alan M. Purdie, Gore, Kilpatrick, Purdie, Metz & Adcock, PC, Ridgeland, Tommy B. Rogers, Tommy B. Rogers, Attorney, Collins, Sarah L. Entrekin, Attorney, Jones County Board of Supervisors, Laurel, Michael C. Barefield, Michael C. Barefield, Attorney, Gulfport, Thomas W. Tyner, Aultman, Tyner, Ruffin & Yarborough, Ltd, Charles E. Lawrence, Jr., Charles E. Lawrence, Jr., Attorney, Hattiesburg, for Pine Belt Regional Solid Wste Management Authority and its Board of Commissioners, Covington County, Board of Commissioner of Pine Belt Regional Solid Waste Management Authority, Board of Commissioner of Pine Belt Regional Solid Waste Management Authority, Perry County, Board of Commissioners of Pine Belt Regional Solid Waste Management Authority, City of Petal, Board of Commissioner of Pine Belt Regional Solid Waste Management Authority, City of Laurel, Board of Commissioner of Pine Belt Regional Solid Waste Management Authority, City of Hattiesburg, Board of Commissioners of Pine Belt Regional Solid Waste Management Authority, defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW PURSUANT TO FED. R. CIV. P. 52(A)

GUIROLA, United States Magistrate Judge.

The question before this Court is whether certain municipal ordinances restricting the disposal of solid waste collected within a specific geographic area constitutes a violation of the Commerce Clause of the United States Constitution. The plaintiffs, Waste Management of Mississippi, Inc. ("Waste Management") and Browning Ferris Waste Systems of Mississippi, LLC ("BFI"), are in the business of collection

and disposal of solid waste. The defendant, Pine Belt Solid Waste Management Authority ("Authority"), caused its member governmental entities to enact solid waste flow control ordinances. Pursuant to these flow control ordinances, all solid waste collected within the Authority boundaries must be directed to the Authority landfill and transfer stations. Plaintiffs filed this action contending that the flow control ordinances discriminate against interstate commence. Defendants counter that these flow control ordinances are valid regulations for the collection and disposal of solid waste. According to defendants, any effect upon interstate commerce is merely incidental and any burden upon interstate commerce is outweighed by the putative local benefits.

## FACTS

The facts in this case are largely undisputed.[1] In an effort to address the public necessity for the safe and efficient collection and disposal of solid waste, Mississippi enacted the "Mississippi Regional Solid Waste Management Authority Act."[2] Among other things, the Act permits local governmental bodies to form regional waste management authorities. In 1992, the Pine Belt Regional Waste Management Authority was created. Its local governmental members included the Cities of Hattiesburg, Laurel and Petal, as well as the Counties of Covington, Jones, Perry, and Lamar.[3] The Authority generates revenue by collecting fees for solid waste transfer and disposal at its facilities. In 1996, the Authority issued revenue bonds to finance capital expenditures, land acquisition, construction and maintenance of a regional landfill and three transfer stations. In the event that the Authority was unable to generate sufficient income to meet its bonded indebtedness, the Authority members would be obligated to make up the shortfall. While it is stipulated that the Authority owns the landfill and transfer stations, these facilities are operated under contract by a private entity, to wit: Enviro Inc. ("Enviro"). The Authority expanded its service area in 1999 to include approximately 22 Mississippi counties. Although the membership of the Authority did not change, the expanded service area permits the Authority to increase its income stream by receiving additional solid waste from the municipalities within the expanded area. At this time, the Authority is in the process of completing a fourth transfer station.

Due primarily to a reduction in the amount of solid waste received at its facilities, the Authority realized that it would be unable to meet its financial obligations in fiscal year 2004. In an effort to increase the volume of solid waste received at its facilities and consequently increase revenue, the Authority decided to direct its members to initiate solid waste flow control ordinances. In July and August of 2002, each member of the Authority enacted identical flow control ordinances which require disposal of all solid waste generated within the geographic boundaries of the Authority at one of its facilities.[4] A viola-

---

1. Throughout these findings and conclusions, the critical testimony and exhibits will be discussed. However, all of the evidence has been considered.

2. .Miss Code Ann. § 17–17–301 through § 17–17–349.

3. Lamar County later withdrew from the Authority.

4. The flow control ordinances were subsequently reenacted in September, October and November of 2002. They each provide in part that all "solid waste generated within the geographic boundaries ... that is placed in the waste stream shall be transported to, stored and managed at the Pine Belt Regional Solid Waste Management Authorities landfill in Perry County, Mississippi, or at a transfer

tion of the flow control ordinance constitutes a misdemeanor offense punishable by fine and/or imprisonment.

The plaintiffs collect, process and dispose of commercial and residential solid waste throughout Mississippi. In addition, plaintiffs own and operate private landfills and transfer stations. Significantly, plaintiffs have numerous private contracts for the collection and disposal of commercial solid waste within the geographic boundaries of the Authority. As a result of the solid waste flow control ordinances enacted by the Authority members, plaintiffs will be prohibited from disposing of solid waste collected within the Authority boundary at their own facilities or any other public or private facility outside of the Authority. According to plaintiffs, the flow control ordinances will increase their operating costs, place in jeopardy private contracts with commercial solid waste producers, and result in an unfair economic advantage for their competitors. Consequently, plaintiffs filed a complaint seeking declaratory, injunctive and monetary relief under 42 U.S.C. § 1983. After the plaintiffs filed their complaint, the parties reached an agreement in which the municipalities would forego enforcement of the flow control ordinances, thus maintaining the status quo pending trial and disposition of this matter on the merits. The matter was tried without a jury. Subsequent to trial, the parties consented to trial and entry of a final judgment by a U.S. Magistrate Judge. The case has been referred pursuant to 28 U.S.C. § 636(c)(1) and by the agreement of the parties has been adjudicated upon the trial record, exhibits and stipulations.

## DISCUSSION

The Authority has undertaken an arduous task. Disposal of ever increasing amounts of solid waste has created a national problem that has produced complex environmental, technical and political issues. The Court must determine whether the solid waste flow control ordinances enacted by the defendants affects interstate commerce and if so, whether these flow control ordinances constitute discrimination against interstate commerce or whether they regulate in an evenhanded manner with only incidental effects on interstate commerce which are outweighed by the putative local benefits.

### The Dormant Commerce Clause

■ The United States Constitution provides that "[t]he Congress shall have Power ... [t]o regulate Commerce ... among the several States." U.S. CONST. art. I, § 8, cl. 3. Although the Commerce Clause is an affirmative grant to Congress, the Commerce Clause has been interpreted by the courts to contain a "negative" aspect. This doctrine, called the "negative" or "dormant" Commerce Clause, is a judicially created limit on a state's power to regulate interstate commerce in the absence of authority from the Congress. It denies the States the power to unjustifiably discriminate against or burden the interstate flow of articles of commerce. *Ore. Waste Sys., Inc. v. Dep't of Envtl. Quality,* 511 U.S. 93, 98, 114 S.Ct. 1345, 1349, 128 L.Ed.2d 13 (1994).

■ The courts have developed two lines of analysis to determine if a law violates the dormant Commerce Clause. First, the court considers whether the law is facially discriminatory, in its practical effect or purpose. *City of Philadelphia v. New Jersey,* 437 U.S. 617, 98 S.Ct. 2531, 57 L.Ed.2d 475 (1978). Laws that discriminate against interstate commerce are virtually *per se* invalid unless the municipality

station owned by the Pine Belt Regional Solid Waste Management Authority."

can demonstrate, under rigorous scrutiny, that the discriminatory law is justified by a valid factor unrelated to economic protectionism and that no nondiscriminatory alternatives exist which will preserve the local interests at stake. *Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333, 353, 97 S.Ct. 2434, 2446, 53 L.Ed.2d 383 (1977); *see also Chem. Waste Mgmt., Inc. v. Hunt*, 504 U.S. 334, 342–45, 112 S.Ct. 2009, 2013–16, 119 L.Ed.2d 121 (1992). Second, if the law does not discriminate against interstate commerce, the court considers whether the law regulates evenhandedly, having only incidental effects on interstate commerce. "Where the statute regulates even-handedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits." *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142, 90 S.Ct. 844, 847, 25 L.Ed.2d 174 (1970) Under *Pike*, the court applies a "balancing test" to determine whether the putative local interests outweigh the burden imposed by the law.

## C & A Carbone, Inc. v. Town of Clarkstown

The seminal decision in regard to solid waste flow control ordinances and their impact on the dormant Commerce Clause is *C & A Carbone, Inc. v. Town of Clarkstown*, 511 U.S. 383, 114 S.Ct. 1677, 128 L.Ed.2d 399 (1994). In *Carbone*, the Town of Clarkstown, New Jersey, wanted to build a transfer station in order to process non-recyclable solid waste. A private contractor agreed to build the facility and run it for five years. During the five year period, the transfer station would be financed by a "tipping fee" collected by the contractor. In addition, the Town of Clarkstown agreed to guarantee a minimum tonnage of solid waste and to pay for any deficiencies between the actual and guaranteed minimum tonnage. Upon expiration of the five-year operating agreement, the contractor agreed to convey the facility to the Town of Clarkstown for one dollar. In an effort to avoid the potential that local taxpayers would be required to pay additional fees to the private operator for solid waste that was never actually delivered, the Town of Clarkstown enacted a flow control ordinance. The flow control ordinance required that all acceptable solid waste generated within the Town of Clarkstown be processed at the new transfer station. C. & A. Carbone, Inc. was cited for violation of the flow control ordinance by exporting solid waste that had been generated within the town's geographic boundaries.

The Supreme Court held that the flow control ordinance enacted by the Town of Clarkstown discriminated against interstate commerce because it permitted only the favored local operator to process waste. The Court reasoned as follows:

[T]he article of commerce is not so much the solid waste itself, but rather the service of processing and disposing of it.

With respect to this stream of commerce, the flow control ordinance discriminates, for it allows only the favored operator to process waste that is within the limits of the town. The ordinance is no less discriminatory because in-state or in-town processors are also covered by the prohibition . . . .

. . . The essential vice in laws of this sort is that they bar the import of the processing service . . . . Put another way, the offending local laws hoard a local resource-be it meat, shrimp, or milk-for the benefit of local businesses that treat it.

The flow control ordinance has the same design and effect. It hoards solid

waste, and the demand to get rid of it, for the benefit of the preferred processing facility.

*Carbone,* 511 U.S. at 391–92, 114 S.Ct. 1677 (citations omitted). Applying strict scrutiny, the Court further held that the discriminatory flow control ordinance was *per se* invalid since the town could have protected its local interests through non-discriminatory alternatives. In so holding, the Court reasoned as follows:

> The flow control ordinance does serve a central purpose that a nonprotectionist regulation would not: It ensures that the town-sponsored facility will be profitable, so that the local contractor can build it and Clarkstown can buy it back at nominal cost in five years. In other words, as the most candid of *amici* and even Clarkstown admit, the flow control ordinance is a financing measure. By itself, of course, revenue generation is not a local interest that can justify discrimination against interstate commerce
> ....
> Clarkstown maintains that special financing is necessary to ensure the long-term survival of the designated facility. If so, the town may subsidize the facility through general taxes or municipal bonds. But having elected to use the open market to earn revenues for its project, the town may not employ discriminatory regulation to give that project an advantage over rival businesses from out of State.

*Carbone,* 511 U.S. at 393–94, 114 S.Ct. 1677 (citations omitted).

### The Public/Private Distinction

In *United Haulers Ass'n, Inc. v. Oneida–Herkimer Solid Waste Mgmt. Auth.,* 261 F.3d 245 (2d Cir.2001) *cert. denied* 534 U.S. 1082, 122 S.Ct. 815, 151 L.Ed.2d 699 (2002), the district court, applying *Carbone,* held that the counties' flow control laws discriminated against interstate commerce in favor of the authority's designated facilities. The Second Circuit reversed. It found the facts in *Carbone* were distinguishable in that the Clarkstown transfer station was owned by a private contractor while the counties' transfers stations were publicly owned. The court held that:

> [A] flow control ordinance governing the processing of waste is not discriminatory under the Commerce Clause unless it favors local private business interests over out-of-state interests. Flow control regulations . . ., which negatively impact all private businesses alike, regardless of whether in-state or out-of-state, in favor of a publicly owned facility, are not discriminatory under the dormant Commerce Clause.

*United Haulers,* 261 F.3d at 263.[5] The case was remanded to the district court for a determination of whether the counties' flow control ordinances passed constitutional muster under the *Pike* balancing test.

■ The majority in *Carbone* did not draw a distinction between publicly and privately owned facilities for purposes of its analysis of the Clarkstown flow control ordinance under the dormant Commerce Clause. Neither has the Fifth Circuit had an occasion to consider the issue. Nonetheless, defendants invite the Court to embrace the public/private distinction in *United Haulers* and evaluate their flow control ordinances under the less demanding *Pike* test. In the absence of clear and binding. precedent supporting the public/private distinction in evaluating the impact of defendants' flow control ordinances on interstate commerce, the majority opin-

---

5. *See also East Coast Recycling, Inc. v. City of Port St. Lucie,* 234 F.Supp.2d 1259 (S.D.Fla. 2002) (recognizing the distinction between public and private ownership and applying the *Pike* test).

ion in *Carbone* controls. It is the opinion of this Court, that the July 2002 flow control ordinances enacted by the Authority, like the flow control ordinance in *Carbone*, discriminate against interstate commerce. The Authority has drawn a ring around itself. Solid waste collected within that ring must be processed at its preferred transfer stations and landfill. These flow control ordinances prevent everyone except the favored local operator from processing solid waste collected within its boundaries and deprives outside access to the local waste disposal market. Consequently, these flow control ordinances hoard "solid waste, and the demand to get rid of it, for the benefit of the preferred processing facility." *Carbone*, 511 U.S. at 392, 114 S.Ct. 1677. It is also the opinion of this Court that the defendants have failed to demonstrate that they had no other means to advance their admitted objective: the generation of adequate revenue to meet their financial obligations. In fact, the trial evidence showed that defendants could have promoted financial viability through increases in taxes, through the imposition of franchise fees [6] or by increasing the amount of solid waste processed at its facilities by accepting solid waste from municipalities outside of the Authority. Thus, like the flow control ordinance in *Carbone*, these flow control ordinances are *pre se* invalid.

Moreover, while the parties have stipulated that the Authority *owns* the landfill and transfer stations, the relationship between the Authority and Enviro (the contract operator) makes it difficult to characterize the Authority landfill and transfer stations as a purely public endeavor. In *United Haulers*, the waste management authority owned *and* operated all of its facilities save one transfer station. *United*

*Haulers*, 261 F.3d at 250. The court was also careful to point out that the "current out-sourcing of the transfer station's operation is a temporary measure." *United Haulers*, at 251. In contrast, the Authority has given no indication that it intends to assume the operation of its facilities or that the current system of private operation of its facilities is other than permanent. Enviro's contract with the Authority essentially gives Enviro complete control over the operation and maintenance of the landfill and transfer stations. Enviro provides all of the equipment and personnel. It controls access to the facilities, and operates and maintains the weight scales and records. While the operating contract does not guarantee a minimum amount of solid waste, payments to Enviro are based upon the amount of solid waste delivered to each facility. Defendants' flow control ordinances not only increase the amount of solid waste processed at its facilities, but they insure Enviro an increased stream of solid waste and the ultimate revenue that it generates. When these factors are considered in combination with the fact that Enviro is also in the solid waste collection and disposal business and that its primary competitors are plaintiffs, the economic advantages associated with the flow control ordinances cannot be categorized as purely public. In sum, the nature of the relationship between the Authority and Enviro is clearly distinguishable from the *United Haulers* case.

Finally, this Court notes that defendants' reliance on the *Pike* balancing test to vindicate these flow control ordinances is misplaced. Assuming arguendo that defendants are entitled to rely on the public/private distinction announced in *United Haulers* and that the *Pike* balancing test applies, under the facts in this case, the

---

6. During trial, the Authority admitted that an alternative means of generating revenue was the collection of a "franchise fee" granting private solid waste collectors a license to collect solid waste within the Authority's geographic boundaries.

flow control ordinances would fail to pass constitutional muster. The concurring opinion in *Carbone* is instructive. Justice O'Connor reasoned that the Town of Clarkstown's ordinance did not discriminate against interstate commerce. *Carbone*, 511 U.S. at 404–05, 114 S.Ct. 1677 (O'Connor, J., concurring). However, applying the *Pike* test, Justice O'Connor determined that Clarkstown's flow control ordinance imposed an excessive burden in relation to the putative local benefits. Justice O'Connor concluded:

That the ordinance does not discriminate against interstate commerce does not, however, end the Commerce Clause inquiry. Even a nondiscriminatory regulation may nonetheless impose an excessive burden on interstate trade when considered in relation to the local benefits conferred.... Moreover, "the extent of the burden that will be tolerated will of course depend on the nature of the local interest involved, and on whether it could be promoted as well with a lesser impact on interstate activities." *Pike*, 397 U.S., at 142, 90 S.Ct., at 847. Judged against these standards, Local Law 9 fails.

The local interest in proper disposal of waste is obviously significant. But this interest could be achieved by simply requiring that all waste disposed of in the town be properly processed *somewhere.* For example, the town could ensure proper processing by setting specific standards with which all town processors must comply.

In fact, however, the town's purpose is narrower than merely ensuring proper disposal. Local Law 9 is intended to ensure the financial viability of the transfer facility. I agree with the majority that this purpose can be achieved by other means that would have a less dramatic impact on the flow of goods. For example, the town could finance the project by imposing taxes, by issuing

municipal bonds, or even by lowering its price for processing to a level competitive with other waste processing facilities. But by requiring that all waste be processed at the town's facility, the ordinance "squelches competition in the waste-processing service altogether, leaving no room for investment from outside."

*Carbone*, at 405–07, 114 S.Ct. 1677 (O'Connor, J., concurring) (citations omitted).

Likewise, defendants' solid waste flow control ordinances were enacted out of the need to generate additional income in order to meet future financial obligations. The Court recognizes that the Authority's need to generate sufficient income to maintain economic viability constitutes a legitimate public purpose, but it is not a permissible basis for interference with interstate commerce. As noted by the Court in *Carbone*, "[b]y itself, ... revenue generation is not a local interest that can justify discrimination against interstate commerce." *Carbone*, at 393, 114 S.Ct. 1677. As noted above, the Authority could have undertaken alternative steps to insure its economic interests without resorting to solid waste flow control. In addition, defendants introduced no evidence at trial which tended to demonstrate that environmental or public health concerns were the motivating force behind enactment of these flow control ordinances. Thus, even under the less rigorous *Pike* test, defendants' solid waste flow control ordinances fail.

### CONCLUSION

It is the opinion of the Court that the solid waste flow control ordinances enacted by the members of the Pine Belt Regional Waste Management Authority affect interstate commerce. It is also the opinion of the Court that these flow control ordinances, like the flow control ordinance in *Carbone*, discriminate against interstate commerce and are *per se* invalid. It is also the opinion of the Court that the

defendants have failed to demonstrate that they had no other means to advance the local governmental interest.

**IT IS THEREFORE ORDERED AND ADJUDGED,** that plaintiffs are entitled to Declaratory Relief as stated herein above and that plaintiffs are entitled to a permanent injunction prohibiting the enforcement of the solid waste flow control ordinances enacted by the defendants in July and August of 2002 and subsequently reenacted in September, October and November of 2002.

**IT IS FURTHER ORDERED AND ADJUDGED,** that all further relief should be, and is hereby denied. The Court shall enter a separate judgement pursuant to Fed.R.Civ.P. 58.