[No. S044869. Dec. 29, 1995.]

PACIFIC MERCHANT SHIPPING ASSOCIATION, Plaintiff and Respondent, v.
HENRY VOSS, as Director, etc., et al., Defendants and Appellants.

## COUNSEL

Daniel E. Lungren, Attorney General, Roderick E. Walston, Chief Assistant Attorney General, Walter Wunderlich, Assistant Attorney General, Charles W. Getz IV and Marc N. Melnick, Deputy Attorneys General, for Defendants and Appellants.

Lillick & Charles, Sher & Blackwell, R. Frederic Fisher, Lawrence N. Minch, David F. Smith, Jeffrey F. Lawrence, Cindy Buys, Minder & Muro and Thomas G. Minder for Plaintiff and Respondent.

## OPINION

MOSK, J.—In this appeal we consider whether two statutes and a regulation authorizing the California Department of Food and Agriculture to levy an inspection fee on ships carrying agricultural goods into California from foreign countries (Food & Agr. Code, §§ 5352 & 5353, subd. (b); Cal. Code Regs., tit. 3, § 3560, subd. (b)), when no such fee is levied on carriers bringing such goods into California from other states, unjustifiably discriminate on their face against foreign commerce in violation of the negative aspect of the foreign commerce clause of the United States Constitution. (U.S. Const., art. I, § 8, cl. 3.)

We shall conclude, as the trial court ruled, that the cited provisions are facially discriminatory and that the discrimination cannot be justified under the controlling "strictest scrutiny" standard. We therefore reverse the judgment of the Court of Appeal holding the provisions to be nondiscriminatory.

### Background

The United States Department of Agriculture (USDA) has long maintained a comprehensive program for inspecting potentially contaminated or

otherwise harmful agricultural products brought into the United States from foreign countries. (See, e.g., 7 U.S.C. § 151 et seq. [Plant Quarantine Act of 1912]; 7 U.S.C. § 150ee ["The Secretary [of the USDA] may promulgate such regulations requiring inspections of products and articles of any character whatsoever and means of conveyance . . . as a condition of their movement into or through the United States, or interstate, and imposing other conditions upon such movement, as he deems necessary to prevent the dissemination into the United States, or interstate, of plant pests, . . ."]; 7 C.F.R. § 330.100 et seq. (1995).) The USDA currently enforces federal quarantines against virtually every country in the world, and these quarantines cover literally thousands of agricultural pests found only outside the United States. (See 7 C.F.R. § 319 (1995).) As part of this comprehensive program, all ships traveling from the specified foreign countries are subject to inspection by federal authorities at their first port of call in the United States. (*Id.*, § 330.105(a) (1995).) As payment for its services, the USDA currently levies a "user fee" of $369.50 per inspection on all owners of nonexempt vessels. (7 C.F.R. §§ 330.107, 354.3(b) (1995).)

In 1990 our Legislature enacted the California Airport and Maritime Plant Quarantine, Inspection, and Plant Protection Act (hereafter the Act) as part of a state-sponsored effort to supplement the USDA's agricultural pest control efforts in California. (Stats. 1990, ch. 1612, § 1, p. 7753.) The Legislature adopted the Act as an urgency statute effective September 30, 1990, because in its view "It is necessary to enact programs that are alternatives to the repeated application of pesticides in order to eradicate pests, including the Mediterranean fruit fly in Los Angeles County. This act would enact one such alternative and, in order to protect the people and the environment from the repeated application of pesticides and to protect California's agriculture from pests as soon as possible, it is necessary that this act take effect immediately." (Stats. 1990, ch. 1612, § 8, p. 7755.)

The Act added sections 5350-5353 to the Food and Agricultural Code,[1] which direct the California Department of Food and Agriculture (the Department) to "establish a program for the inspection of conveyances entering California through airport and maritime facilities to prevent the introduction into, or the spread within, this state of pests." (§ 5350, subd. (a).) The Act specifically requires that the Department maintain plant quarantine inspection stations at California's airports and marine terminals (*id.*, subd. (b)) and establish a program for disseminating information regarding the state's agricultural pest control and quarantine requirements at such points of entry (*id.*, subd. (c)). However, the Act does not expressly require the Department

---

[1]Unless otherwise indicated, all further statutory references are to this code.

to establish and operate its own state-run inspection sites at airports and marine terminals, but instead broadly authorizes the Department to "contract with federal and state agencies . . . to assist [it] in carrying out the purposes of [the Act]." (§ 5353, subd. (g).)

On June 24, 1991, the Department entered into a "reimbursable cooperative agreement" (RCA) with the USDA. The RCA provided that the Department would pay the USDA to intensify its existing regulatory efforts by hiring additional federal agents to inspect ships and airplanes carrying agricultural goods into California from outside the United States. As a result of the RCA, the USDA was able to hire seven additional marine inspectors and forty-four additional airport inspectors. The RCA expressly provided, however, that it was to have no effect on the nature of the federal inspections; rather, it was intended only to make it possible for the USDA to increase its staff and perform more inspections. This arrangement with the USDA is the sole means by which the Department has implemented its duty to provide airport and marine inspections under section 5350, subdivision (a); the Department has never established a state-run commercial inspection program at airports or marine terminals. The original RCA expired on September 30, 1991, but was renewed through September 30, 1992, with minor revisions. There is no indication in the record whether the RCA was renewed thereafter.

For many years the Department has also inspected agricultural goods entering California by truck from other states. (See §§ 5341 & 5341.5.)[2] Rather than contracting with a federal agency for this service, however, the Department itself maintains 16 state-run inspection sites on California's borders, staffed by some 126 state inspectors. Unless there are extraordinary circumstances, these inspectors enforce only California's agricultural quarantines; they do not regularly enforce federal quarantines or inspect commerce originating in foreign countries because the Department assumes that federal authorities inspected these goods when they first entered the United States and there is no reason to perform a second inspection.

The focus of this case is not on the legitimacy of California's overall agricultural inspection program or the propriety of the particular means that the Department has chosen to implement its regulatory obligations. Rather, we are here concerned with only one narrow issue: whether the mechanism that the Legislature has created to *fund* the Department's implementation of its statutory obligation under section 5350, subdivision (b), to provide for the

---

[2]The Department does not maintain truck inspection stations at the Mexican border. Instead, the USDA provides such inspections at federal inspection sites. (See 7 C.F.R. §§ 320.1-320.9 (1995).)

inspection of ships carrying agricultural goods into California from foreign countries passes muster under the federal Constitution. We turn to that funding mechanism.

Section 5352 of the Act requires the Department to derive the funding needed to satisfy its obligations by "levy[ing] a fee on commercial marine carriers, based on the schedule established pursuant to Section 5353, for the use of marine terminal facilities for plant and animal pest inspection, quarantine, and eradication."[3] Section 5352 also requires the Department to "identify and establish a list of countries which [it] has reason to believe are potential sources of exotic plant and animal pests." Section 5353, subdivision (b), then provides that "Each commercial marine carrier engaged in foreign commerce which carries animals or plants or other materials which are, or are likely to be, infected or infested with any pest shall pay a fee of two hundred dollars ($200) to the [Department] upon the initial arrival in this state of the carrier on a voyage which originated outside the United States from a country identified and listed by the [Department] . . . , or which made an intermediate stop on that voyage in a country identified and listed by the [Department] . . . ."[4]

The Act further authorizes the Department, "by regulation, [to] increase or decrease any of the charges or fees prescribed in [section 5353, subdivision (b)] upon determining that the revenue received is inadequate or in excess of the amount needed to conduct an effective inspection program. The maximum adjusted charge or fee shall not exceed [$600]." (§ 5353, subd. (f).) The Department initially adopted a regulation setting the marine inspection fee at $200 effective April 1, 1991; it later amended the regulation by reducing the fee to $100 effective January 1, 1995. (Cal. Code Regs., tit. 3, § 3560, subd. (b).)

The Department gave the following explanation for the 1995 fee reduction in the informative digest section of the public notice of amendment: "Since

---

[3]The Legislature has enacted a similar provision relating to airport inspections: "The [Department] shall levy a service charge . . . based on the schedule established pursuant to Section 5353, on each air carrier or foreign air carrier engaged in foreign air commerce . . . for the use of airport facilities for plant and animal pest inspection, quarantine, and eradication." (§ 5351, subd. (a).)

[4]Again the Legislature has enacted a virtually identical provision regarding airport inspections: "Each air carrier or foreign air carrier engaged in foreign air commerce which carries animals or plants or other materials which are, or are likely to be, infected or infested with any pest shall pay a charge of eighty-five dollars ($85) to the [Department] upon the initial landing in this state of each flight of the carrier which originates outside the United States." (§ 5353, subd. (a).) The Department initially adopted a regulation setting the fee at $85 effective April 1, 1991; it later reduced the fee to $43 effective January 1, 1995. (Cal. Code Regs., tit. 3, § 3560, subd. (a).)

this inspection program was established in 1991, the Department has contracted with the United States Department of Agriculture (USDA) to perform the authorized inspections. The Secretary [of the Department] has determined that an effective inspection program can now be conducted with revenues from the lower service charge and user fee rates because the USDA is starting to provide inspections of international carriers at an adequate level. The USDA is now committed to supporting federal inspectors who previously had been funded by state contract.

"The revenue generated by the lowered service charges and user fees will be used for a program which will focus on oversight and coordination with the USDA on inspections of international carriers, investigations of smuggling, and intensification of public awareness and education efforts. Significant increases in the number of international travelers, levels of foreign trade and repeated exotic pest infestations in California have created a need for an improved inspection program to protect California's $19.9 billion agricultural industry."[5]

In the 1992-1993 fiscal year, the Department collected inspection fees under this program totaling approximately $4.3 million, levied at the higher, pre-1995 rate. Of this $4.3 million, approximately one-fifth was collected as foreign marine inspection fees and approximately four-fifths as foreign airplane inspection fees. However, the Department used only $2.4 million of this aggregate amount to satisfy its obligations to the USDA for both airport and marine inspections. Approximately $1.6 million of the remaining $1.9 million was allocated to administrative costs and educational activities.

The Department's own state-run program for inspecting agricultural goods entering California from other states—as opposed to agricultural goods entering California from foreign countries—is funded very differently. Carriers of such domestic goods pay no fee at all for routine inspections.[6] The state currently pays for routine domestic inspections from the general fund, and has done so for many years. As of 1992, the state-run inspection program for out-of-state domestic agricultural goods cost California taxpayers an average of approximately $8.4 million each year.

In December 1991 plaintiff Pacific Merchant Shipping Association (hereafter Pacific Merchant), an unincorporated association of marine carriers,

---

[5]Plaintiff's request that we take judicial notice of the Department's public Notice of Amendment of California Code of Regulations, title 3, section 3560, subdivision (b), is granted. (Evid. Code, §§ 452, subd. (b), 459, subd. (a).)

[6]They are charged only for special services such as fumigation, destruction of contaminated goods, or special delivery arrangements.

brought this action on behalf of a class of carriers that had paid the foreign marine inspection fee. Pacific Merchant's operative pleading names Henry Voss, the Director of the Department, and Islam Siddiqui, the assistant director of the Department and the head of its Plant Pest and Quarantine Division, as defendants in their official capacities,[7] and alleged that the Department's overall mechanism for funding its agricultural inspection program is unconstitutional, inter alia because it imposes a discriminatory and unreasonable burden on carriers in foreign commerce that is not imposed on carriers in domestic interstate commerce, in violation of the federal commerce clause.[8]

The trial court granted summary judgment in favor of Pacific Merchant on the ground that the marine inspection fee unjustifiably discriminates on its face against foreign commerce in violation of the commerce clause of the United States Constitution. The court reasoned that "The evidence submitted by the [Department] in its supplemental papers is sufficient to support the imposition of a higher fee on foreign ship inspections as opposed to interstate trucking. However, the [Department] has presented no evidence which explains why no fee is collected on interstate inspections. The facts are undisputed that overall the state incurs greater costs in performing the interstate inspections. Therefore it is the burden of the state to justify its fee system. The statute is facially discriminatory against foreign commerce and as such must be examined with the strictest scrutiny. The [Department's] justification does not pass that test." The court entered a judgment that declared the challenged provisions unconstitutional, enjoined the Department from collecting foreign marine inspection fees, and ordered a refund. The Department appealed.

The Court of Appeal reversed the judgment on the ground that there was a triable issue of fact as to whether the particular types of foreign commerce and domestic interstate commerce involved in this case are sufficiently "similarly situated" that they can be compared for the purpose of determining whether the challenged funding mechanism is discriminatory.[9]

---

[7]For ease of reference, defendants Voss and Siddiqui will hereafter be referred to collectively as the Department.

[8]Throughout this opinion, the terms "foreign commerce" and "foreign marine commerce" will be used to refer to agricultural goods brought into California from outside the United States. The term "domestic interstate commerce" will refer to agricultural goods brought into California from other states. The term "intrastate commerce" will denote agricultural goods transported exclusively within California.

[9]The Court of Appeal also concluded there were triable issues of fact regarding Pacific Merchant's other contentions, namely, that the foreign marine inspection fee violates the tonnage duty clause (U.S. Const., art. I, § 10, cl. 3) and export-import clause (*id.*, art. I, § 10,

We granted review limited to the issue whether the foreign marine inspection fee in question violates the commerce clause of the United States Constitution.

## 1. *The Negative Commerce Clause*

■ The commerce clause of the federal Constitution empowers Congress to enact laws "To regulate commerce with foreign nations, and among the several states, and with the Indian tribes." (U.S. Const., art. I, § 8, cl. 3.) The actual language of the clause, however, places no express limits on the authority of the *states* to regulate such commerce. This rather striking omission has been characterized as one of the "great silences of the Constitution." (*Hood & Sons* v. *Du Mond* (1949) 336 U.S. 525, 535 [93 L.Ed. 865, 872, 69 S.Ct. 657].) Nevertheless, the United States Supreme Court has repeatedly held for over a century that the commerce clause also limits the states' power to regulate both domestic interstate and foreign commerce, whether or not Congress has acted. (See, e.g., *Barclays Bank* v. *Franchise Tax Bd. of California* (1994) 512 U.S. 298 [129 L.Ed.2d 244, 257, 114 S.Ct. 2268, 2276] (*Barclays Bank*) [the commerce clause "has long been understood . . . to provide 'protection from state legislation inimical to the national commerce [even] where Congress has not acted . . . .' "]; *Oregon Waste Systems* v. *Dept. of Env. Quality* (1994) 511 U.S. 93 [128 L.Ed.2d 13, 20, 114 S.Ct. 1345, 1349] (*Oregon Waste*) ["Though phrased as a grant of regulatory power to Congress, the Clause has long been understood to have a 'negative' aspect that denies the States the power unjustifiably to discriminate against or burden the interstate flow of articles of commerce."]; accord, *Associated Industries of Missouri* v. *Lohman* (1994) 511 U.S. 641, ___ [128 L.Ed.2d 639, 645-646, 114 S.Ct. 1815, 1820]; *Wyoming* v. *Oklahoma* (1992) 502 U.S. 437, 454 [117 L.Ed.2d 1, 22-23, 112 S.Ct. 789]; *Lewis* v. *BT Investment Managers, Inc.* (1980) 447 U.S. 27, 35 [64 L.Ed.2d 702, 711, 100 S.Ct. 2009]; *Welton* v. *State of Missouri* (1876) 91 U.S. (1 Otto) 275 [23 L.Ed. 347].) Thus, any state statute or regulation that impacts domestic interstate or foreign commerce is subject to judicial scrutiny under the commerce clause unless the statute or regulation has been preempted, or expressly authorized, by an act of Congress. (See, e.g., *Atlantic Coast Demo.* v. *Bd. of Chosen Freeholders* (3d Cir. 1995) 48 F.3d 701, 710.) The commerce clause's implicit, self-executing restriction on the states' power to regulate domestic interstate and foreign commerce is commonly referred to

cl. 2) of the federal Constitution, that it conflicts with the General Agreement on Tariffs and Trade, and that it is preempted by federal law. These claims were not properly before the Court of Appeal because the trial court expressly declined to address them in the first instance and limited its judgment to the commerce clause claim.

as the "negative" or "dormant" commerce clause. (*Barclays Bank, supra,* 512 U.S. 298, __, fn. 9 [129 L.Ed.2d 244, 257, 114 S.Ct. 2268, 2276].)

Although the negative commerce clause was derived essentially by implication from the clause's express "positive" grant of legislative authority to Congress, it is by no means simply an incidental emanation or penumbra of that clause. To the contrary, "The 'negative' aspect of the Commerce Clause was considered the more important by the 'father of the Constitution,' James Madison. In one of his letters, Madison wrote that the Commerce Clause 'grew out of the abuse of the power by the importing States in taxing the nonimporting, and was intended as a negative and preventive provision against injustice among the States themselves, rather than as a power to be used for the positive purposes of the General Government.' 3 M. Farrand, Records of the Federal Convention of 1787, p. 478 (1911)." (*West Lynn Creamery, Inc.* v. *Healy* (1994) 512 U.S. 186, __, fn. 9 [129 L.Ed.2d 157, 166, 114 S.Ct. 2205, 2211]; see also *Hughes* v. *Oklahoma* (1979) 441 U.S. 322, 325-326 [60 L.Ed.2d 250, 255, 99 S.Ct. 1727] [commerce clause reflected the concern of the framers "to avoid the tendencies toward economic Balkanization that had plagued relations among the Colonies and later among the States under the Articles of Confederation"]; *Baldwin* v. *G.A.F. Seelig* (1935) 294 U.S. 511, 522 [79 L.Ed. 1032, 1038, 55 S.Ct. 497, 101 A.L.R. 55] ["a chief occasion of the commerce clauses was 'the mutual jealousies and aggressions of the States, taking form in customs barriers and other economic retaliation' "]; see generally, The Federalist Nos. 41, 42 [Madison]; 2 Bailyn, The Debates on the Federal Constitution (1993) p. 662 [Madison's speech at the Virginia Ratifying Convention, June 11, 1788]; 3 Farrand, Records of the Federal Convention of 1787 (rev. ed. 1966) p. 547 [Madison's Preface to Debates in the Convention of 1787, stating inter alia that under the Articles of Confederation the "want of a general power over Commerce led to an exercise of this power separately, by the States, [which] not only proved abortive, but engendered rival, conflicting and angry regulations."].)

James Madison was not alone in his views. Another important contemporary figure, Alexander Hamilton, wrote that the federal government should be authorized to regulate domestic interstate and foreign commerce and that the states' legislative power on this topic should be limited, lest "The interfering and unneighbourly regulations of some States contrary to the true spirit of the Union . . . be multiplied and extended till they became not less serious sources of animosity and discord, than injurious impediments to the intercourse between the different parts of the confederacy." (The Federalist No. 22 (Cooke ed. 1961) p. 137.) According to Hamilton, the absence of

such uniform national control might gradually lead to what we would now call the balkanization of the several states, undermine Congress's ability to enter into agreements with foreign nations on behalf of the United States as a whole, restrict foreign commerce to the point that our national resources would lie fallow, and eventually cause citizens of each state to treat the citizens of other states like foreigners rather than fellow citizens of the United States. (*Id.* at pp. 135-137; see also The Federalist No. 11 [Hamilton].) Indeed, there is evidence to suggest that Hamilton's prophecy could well have come true had the states not consented to give up the power to regulate commerce by ratifying the Constitution. (See *Brown* v. *Maryland* (1827) 25 U.S. (12 Wheat.) 419, 445-446 [6 L.Ed. 678, 688] ["The oppressed and degraded state of commerce, previous to the adoption of the constitution, can scarcely be forgotten. It was regulated by foreign nations, with a single view to their own interests; and our disunited efforts to counteract their restrictions, were rendered impotent, by want of combination."]; *Gibbons* v. *Ogden* (1824) 22 U.S. (9 Wheat.) 1, 226 [6 L.Ed. 23, 77] (conc. opn. of Johnson, J.) [Prior to the adoption of the Constitution "There was not a state in the Union, in which there did not . . . exist a variety of commercial regulations; . . ."].)

Thus, despite the fact that there is no express textual basis in the commerce clause to justify a limitation on the states' authority to regulate domestic interstate and foreign commerce, there can be no doubt whatever that such a limitation was intended by the framers and that the matter was of paramount concern to many or all of the delegates to the Constitutional Convention of 1787. Indeed, Chief Justice John Marshall later wrote that "It may be doubted, whether any of the evils proceeding from the feebleness of the federal government [under the Articles of Confederation], contributed more to that great revolution which introduced the present system, than the deep and general conviction, that commerce ought to be regulated by congress." (*Brown* v. *Maryland, supra*, 25 U.S. (12 Wheat.) 419, 446 [6 L.Ed. 678, 688].)

### 2. *The Issue of Facial Discrimination*

Having placed the matter in perspective, we focus on the narrow issue before us: whether the inspection fee levied on vessels in foreign commerce by authority of the challenged provisions (§§ 5352 & 5353, subd. (b); Cal. Code Regs., tit. 3, § 3560, subd. (b)) violates the negative commerce clause of the United States Constitution.

"[T]he first step in analyzing any law subject to judicial scrutiny under the negative Commerce Clause is to determine whether it 'regulates

evenhandedly with only "incidental" effects on interstate [or foreign] commerce, or discriminates against interstate [or foreign] commerce.' . . . If a restriction on commerce is discriminatory, it is virtually *per se* invalid. [Citations.] By contrast, nondiscriminatory regulations that have only incidental effects on interstate [or foreign] commerce are valid unless 'the burden imposed on such commerce is clearly excessive in relation to the putative local benefits.' " (*Oregon Waste, supra*, 511 U.S. 93, __ [128 L.Ed.2d 13, 21, 114 S.Ct. 1345, 1350].) The party challenging the statute's validity bears the burden of showing discrimination. (*Hughes* v. *Oklahoma, supra*, 441 U.S. 322, 336 [60 L.Ed.2d 250, 261-262].)

 In this context " 'discrimination' simply means differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter." (*Oregon Waste, supra*, 511 U.S. 93, __ [128 L.Ed.2d 13, 21, 114 S.Ct. 1345, 1350].) Such discrimination may take any of three forms: first, the state statute may facially discriminate against interstate or foreign commerce; second, it may be facially neutral but have a discriminatory purpose; third, it may be facially neutral but have a discriminatory effect. (*Chemical Waste Management, Inc.* v. *Hunt* (1992) 504 U.S. 334, 344, fn. 6 [119 L.Ed.2d 121, 133, 112 S.Ct. 2009] (*Chemical Waste*) [statute may be discriminatory either in purpose or effect]; *Hughes* v. *Oklahoma, supra*, 441 U.S. 322, 336 [60 L.Ed.2d 250, 261] [state statute may discriminate "either on its face or in practical effect"]; *SDDS, Inc.* v. *State of S.D.* (8th Cir. 1995) 47 F.3d 263, 267 [listing the three types of discrimination and citing cases illustrating each].)

In determining whether a state statute is *facially* discriminatory, the following matters are irrelevant: the justification that the state offers for the discrimination, the legitimacy of the state interests that the statute is designed to protect, the degree and scope of the discrimination, and the volume of commerce affected. (*Oregon Waste, supra*, 511 U.S. 93, __ [128 L.Ed.2d 13, 22, 114 S.Ct. 1345, 1350] ["the purpose of, or justification for, a law has no bearing on whether it is facially discriminatory"]; *Kraft General Foods, Inc.* v. *Iowa Dept. of Revenue and Finance* (1992) 505 U.S. 71, 81 [120 L.Ed.2d 59, 69, 112 S.Ct. 2365] (*Kraft General Foods*) ["a State may not advance its legitimate goals by means that facially discriminate against foreign commerce"]; *Chemical Waste, supra*, 504 U.S. 334, 341-342 [119 L.Ed.2d 121, 131-132] [listing high court decisions invalidating state statutes attempting to further a " 'presumably legitimate goal' " through illegitimate discriminatory means]; *Wyoming* v. *Oklahoma, supra*, 502 U.S. 437, 455 [117 L.Ed.2d 1, 23] ["The volume of commerce affected measures only the *extent* of the discrimination; it is of no relevance to the determination

whether a State has discriminated . . . ."]; *SDDS, Inc.* v. *State of S.D.*, *supra*, 47 F.3d 263, 271, fn. 12 [degree and scope of discrimination irrelevant].)

█ Pacific Merchant contends that the statutes and regulation here at issue facially discriminate against foreign commerce because they impose inspection fees only on vessels "engaged in foreign commerce . . . on a voyage which originated outside the United States from a country identified and listed by the [Department] . . . , or which made an intermediate stop on that voyage in a country identified and listed by the [Department]" (§ 5353, subd. (b)), while no state statute or regulation authorizes the Department to levy such an inspection fee on carriers of domestic interstate commerce, whether transported by truck, ship, or any other means; instead, the Legislature has allowed the Department to provide routine inspections to such domestic carriers free of charge at California taxpayer expense.

We recognize that this case is somewhat atypical in that Pacific Merchant contends the cited provisions are discriminatory because they favor domestic interstate commerce over foreign commerce, but does not contend the provisions also favor California intrastate commerce. It is perhaps more common for a party challenging a state statute on commerce clause grounds to contend the statute constitutes local protectionism because it discriminates against out-of-state commercial interests in favor of in-state interests. (See, e.g., *Baldwin* v. *G.A.F. Seelig, supra*, 294 U.S. 511, 527 [79 L.Ed. 1032, 1040] [key principle underlying negative commerce clause is that "one state in its dealings with another may not place itself in a position of economic isolation"].) █ But this is a distinction without a difference: as the United States Supreme Court recently held, "a State's preference for domestic commerce over foreign commerce is inconsistent with the Commerce Clause even if the State's own economy is not a direct beneficiary of the discrimination. As the absence of local benefit does not eliminate the international implications of the discrimination, it cannot exempt such discrimination from Commerce Clause prohibitions." (*Kraft General Foods, supra*, 505 U.S. 71, 79 [120 L.Ed.2d 59, 68].) Nor does this distinction render distinguishable the many high court precedents addressing commerce clause challenges to state statutes that assertedly discriminate between intrastate and domestic interstate commerce. As the parties rightly concede, the fundamental issue is the same both when the challenging party asserts that a state statute discriminates between intrastate and domestic interstate commerce and when the party asserts that the statute discriminates between domestic interstate commerce and foreign commerce: in each case the issue is whether the statute treats the federally protected class of commerce less

favorably than other classes of commerce. (Compare, for example, *Oregon Waste, supra,* 511 U.S. 93, __ [128 L.Ed.2d 13, 21-22, 114 S.Ct. 1345, 1350] [discrimination between intrastate and interstate commerce], and *Kraft General Foods, supra,* 505 U.S. 71, 75 [120 L.Ed.2d 59, 65-66] [discrimination between domestic and foreign commerce].)

Turning therefore to the merits of this appeal, we believe that the high court's reasoning in two recent cases—*Oregon Waste, supra,* 511 U.S. 93, and *Chemical Waste, supra,* 504 U.S. 334—requires us to conclude that the provisions in issue here facially discriminate against foreign commerce. In *Chemical Waste* the high court reviewed the constitutionality of an Alabama statute imposing a base fee of $26.50 per ton on all hazardous waste disposed of at commercial facilities in Alabama and an "additional fee" of $72 per ton if the hazardous waste was generated out of state. In upholding the statute the Alabama Supreme Court identified several purposes that it served, including protection of the health and safety of the local citizenry, environmental conservation, and compensation for the costs and burdens that out-of-state waste generators impose on Alabama by dumping their hazardous waste in that state. The United States Supreme Court acknowledged that "These may all be legitimate local interests" (504 U.S. at p. 343 [119 L.Ed.2d at p. 133]), but held them irrelevant to the question whether the statute facially discriminated against interstate commerce: " ' "[T]he evil of protectionism can reside in legislative means as well as legislative ends. . . . [W]hatever [the state's] ultimate purpose, it may not be [accomplished] by discriminating against articles of commerce coming from outside the State unless there is some reason, apart from their origin, to treat them differently." ' " (*Id.* at pp. 340-341 [119 L.Ed.2d at p. 131].)[10] The high court stressed (*Ibid.*) that it had " ' "consistently found parochial legislation of this kind to be constitutionally invalid," ' " citing a number of cases in which " 'a presumably legitimate goal was sought to be achieved by the illegitimate means of isolating the State from the national economy.' " (*Id.* at pp. 341-342 [119 L.Ed.2d at pp. 131-132].) The court concluded that the Alabama statute was facially discriminatory because it imposed a higher fee on waste coming from outside the state than on waste generated in state, reasoning that " '[A] State may not tax a transaction or incident more heavily when it crosses state lines than when it occurs entirely within the State.' [Citations.]" (*Id.* at p. 342 [119 L.Ed.2d at p. 132].)

Two years later, in *Oregon Waste, supra,* 511 U.S. 93, the high court considered a constitutional attack on Oregon statutes imposing a total

---

[10]The qualifying clause refers to the state's burden to *justify* any discrimination found to be present, a separate step that we discuss below. (Pt. 3, *post.*)

disposal fee of $3.10 per ton on disposal of waste originating out of state but only $0.85 per ton on disposal of waste originating in state. The court reasoned that "In *Chemical Waste*, we easily found Alabama's surcharge on hazardous waste from other States to be facially discriminatory because it imposed a higher fee on the disposal of out-of-state waste than on the disposal of identical in-state waste. 504 U.S., at 340-343 [119 L.Ed.2d at 131-133, 112 S.Ct. at 2013-2014]. We deem it equally obvious here that Oregon's $2.25 per ton surcharge is discriminatory on its face. The surcharge subjects waste from other States to a fee almost three times greater than the $0.85 per ton charge imposed on solid in-state waste. The statutory determinant for which fee applies to any particular shipment of solid waste to an Oregon landfill is whether or not the waste was 'generated out-of-state.' [Citation.] It is well-established, however, that a law is discriminatory if it ' "tax[es] a transaction or incident more heavily when it crosses state lines than when it occurs entirely within the State." ' *Chemical Waste, supra,* at 342 [119 L.Ed.2d at 132-133, 112 S.Ct. at 2014] [citations].

"Respondents argue, and the Oregon Supreme Court held, that the statutory nexus between the surcharge and 'the [otherwise uncompensated] costs to the State of Oregon and its political subdivisions of disposing of solid waste generated out-of-state,' [citation] necessarily precludes a finding that the surcharge is discriminatory. We find respondents' narrow focus on Oregon's compensatory aim to be foreclosed by our precedents. As we reiterated in *Chemical Waste*, the purpose of, or justification for, a law has no bearing on whether it is facially discriminatory. See 504 U.S., at 340-342 [119 L.Ed.2d at 131-132, 112 S.Ct. at 2013.] [Citation.] Consequently, even if the surcharge merely recoups the costs of disposing of out-of-state waste in Oregon, the fact remains that the differential charge favors shippers of Oregon waste over their counterparts handling waste generated in other States. In making that geographic distinction, the surcharge patently discriminates against interstate commerce." (511 U.S. at p. __ [128 L.Ed.2d at pp. 21-22, 114 S.Ct. at p. 1350], fn. omitted.)

The high court's reasoning on the issue of facial discrimination is equally applicable to the statutes and regulation before us. Here, as in *Oregon Waste* and *Chemical Waste*, the challenged provisions expressly burden a federally protected class of commerce—in this case foreign commerce—by exacting a fee for all routine inspections, while leaving all other classes of commerce—most notably domestic interstate commerce—entirely unburdened by such a fee. The sole "statutory determinant" for whether the fee applies to any particular shipment into California is whether it is carried in a vessel "engaged in foreign commerce . . . on a voyage which originated

outside the United States from a country identified and listed by the [Department] . . . , or which made an intermediate stop on that voyage in a country identified and listed by the [Department]" (§ 5353, subd. (b)). The determinant is thus exclusively a matter of geography, and "In making that geographic distinction, the [inspection fee] patently discriminates against [foreign] commerce." (*Oregon Waste, supra,* 511 U.S. 93, __ [128 L.Ed.2d 13, 22, 114 S.Ct. 1345, 1350].)

Indeed, the discrimination is even more patent in the matter before us than in *Chemical Waste* or *Oregon Waste.* In both of those cases the in-state beneficiaries of the statutory scheme paid at least *some* fee; here, carriers in domestic interstate commerce pay no fee whatever. The consequence is dramatic. In *Oregon Waste,* out-of-state waste was subjected to a total fee 3.6 times greater than in-state waste ($3.10 ÷ $0.85); similarly, in *Chemical Waste* the disparity was 3.7 ($98.50 ÷ $26.50). By contrast, if for example the domestic interstate commerce in the case at bar had been charged an inspection fee of even $1 per shipment, foreign commerce would have been subjected to a fee one hundred times greater ($100 ÷ $1). But the reality is still worse: the charge against domestic interstate commerce is zero. Because the disparity between any number and zero is infinite, foreign commerce is thus subjected to a fee *infinitely* greater than domestic interstate commerce.

The decision of the Court of Appeal to the contrary is predicated on an erroneous line of reasoning. The Court of Appeal in effect acknowledged the force of the United States Supreme Court decisions discussed above: "Pacific Merchant purports to lump all inspections performed by the Department into what it views as a single pest-prevention program, a view which allows it to posit facial discrimination in the statute at issue because it imposes fees only on certain inspections. Were we to accept this characterization, Pacific Merchant would need to do little other than point to the waste disposal fee cases cited above (or cases in which taxes are imposed on one type of commerce and not another) and demand that the Department produce evidence demonstrating a compelling reason for charging fees for one and not the other. This would be a Sisyphean task for the Department, because fees imposed in discriminatory manner by a single program (or discriminatory fees and taxes unrelated to a substantive regulatory program) are inevitably stricken down." (Fn. omitted.)

The Court of Appeal declined to so hold, however, because it believed that "Unlike the waste-disposal cases in which the high court was presented with a single regulatory program charging disparate fees (or cases where there are no regulatory programs at all), we here have an inspection program

for ships (and planes) *administratively and financially segregated* from either the general fund or even the remainder of the Department's budget; in point of fact, the inspections themselves are even performed almost entirely by a different sovereign [USDA] subsidized by California." (Italics added.)

This effort to distinguish *Oregon Waste* and *Chemical Waste* is unavailing. The "financial segregation" stressed by the Court of Appeal is the very disparity in the Department's funding scheme—i.e., foreign commerce is charged an inspection fee but domestic interstate commerce inspections are paid for out of the general fund—that renders the scheme facially discriminatory under *Oregon Waste* and *Chemical Waste*. And the fact that the Department has contracted out the administration of the foreign commerce inspection program to the USDA is without significance: the discrimination is not in who administers the program, but in who pays for it. The funding scheme would be no less discriminatory if the Department were to abrogate its arrangement with the USDA and undertake to inspect foreign commerce itself.[11]

■ From this premise, nevertheless, the Court of Appeal concluded that "Since we have discrete regulatory programs under consideration, only one of which assesses the fees at issue, Pacific Merchant must thus initially demonstrate that the inspections of its ships are *sufficiently similar* to the other inspections taking place under the Department's other programs." (Italics added.) The court then held that Pacific Merchant did not prove such "similarity" as a matter of law, and hence was not entitled to summary judgment on the issue of discrimination.

The Court of Appeal cited no authority for its requirement that in order to show that the challenged fee structure is facially discriminatory Pacific Merchant must prove that the burdened class of foreign commerce and the unburdened class of domestic interstate commerce are "similarly situated." The Department now contends that requirement is supported by *Halliburton Oil Well Cementing Co.* v. *Reily* (1963) 373 U.S. 64 [10 L.Ed.2d 202, 83 S.Ct. 1201] (*Halliburton*), and its progeny. Thus in *Halliburton* the high court declared that "equal treatment for in-state and out-of-state taxpayers *similarly situated* is the condition precedent for a valid use tax on goods imported from out-of-state." (*Id.* at p. 70 [10 L.Ed.2d at p. 207], italics added.) More recently, in *Kraft General Foods, supra,* 505 U.S. 71, 80,

---

[11]Although the Court of Appeal did not identify other differences in the way the Department administers foreign commerce and domestic interstate commerce inspection programs, any such differences would be equally immaterial: the federal constitutional validity of the funding scheme cannot be made to depend on the Department's administrative convenience. (See, e.g., *Kraft General Foods, supra,* 505 U.S. 71, 81 [120 L.Ed.2d 59, 69].)

footnote 23 [120 L.Ed.2d 59, 68], the high court reiterated that "In considering claims of discriminatory taxation under the Commerce Clause, . . . it is necessary to compare the taxpayers who are 'most similarly situated,'" citing *Halliburton.*

It is unclear from the Supreme Court jurisprudence, however, whether the "similarly situated" requirement applies outside the context in which it arose, i.e., challenges to state *taxes*—particularly "compensatory" taxes— that assertedly discriminate against federally protected commerce. *Halliburton* is such a case, involving a state's use tax calculated on a higher basis for out-of-state manufacturer-users than for in-state manufacturer-users. *Kraft General Foods* is also such a case, involving a state's business tax on corporate income that taxed dividends received from foreign subsidiaries but not dividends received from domestic subsidiaries. And the same is true of the other progeny of *Halliburton* cited by the Department.[12]

This pattern does not appear to be a coincidence. Our research shows that the United States Supreme Court has never even cited, much less relied on, *Halliburton, supra,* 373 U.S. 64, in any case that did not involve a challenge to a state *tax* on foreign or domestic interstate commerce. Indeed, the Department cites no precedent of any kind that applies the "similarly situated" requirement outside the tax context. In particular, none of the high court cases reviewing a commerce clause challenge to a state *regulatory* statute—whether involving discriminatory fees as in *Oregon Waste* and *Chemical Waste* or outright prohibitions on imports or exports as in *Wyoming* v. *Oklahoma, supra,* 502 U.S. 437, and *Hughes* v. *Oklahoma, supra,* 441 U.S. 322—even mentioned, much less applied, the "substantially similar" requirement in their discussion of the issue of discrimination.

It seems most appropriate that the requirement be imposed, moreover, in determining the validity of a *compensatory* tax. As the high court recently reiterated, a use tax that applies only to goods purchased out of state "may be saved from constitutional infirmity if it is a valid 'compensatory tax' designed simply to make interstate commerce bear a burden already borne by intrastate commerce. . . . To ensure that the State is indeed merely imposing countervailing burdens on comparable transactions, we have required that the taxes on interstate and intrastate commerce be imposed on

[12]*Bacchus Imports, Ltd.* v. *Dias* (1984) 468 U.S. 263 [82 L.Ed.2d 200, 104 S.Ct. 3049], involved a state's excise tax on wholesale liquor sales that exempted the two locally made spirits. *Armco Inc.* v. *Hardesty* (1984) 467 U.S. 638 [81 L.Ed.2d 540, 104 S.Ct. 2620], dealt with a state's gross receipts tax on businesses selling tangible property at wholesale that exempted local manufacturers. And *National Meat Ass'n* v. *Deukmejian* (9th Cir. 1984) 743 F.2d 656, affd. *per curiam* (1985) 469 U.S. 1100 [83 L.Ed.2d 766, 105 S.Ct. 768], involved a per-pound tax that California imposed only on out-of-state processed beef.

'substantially equivalent event[s].'" (*Associated Industries of Missouri* v. *Lohman, supra*, 511 U.S. 641, __ [128 L.Ed.2d 639, 647, 114 S.Ct. 1815, 1821].)

The point is underscored by one of the two recent regulatory fee cases we find controlling here, *Oregon Waste*. It is true, as the Department quotes in its brief, that in *Oregon Waste* the high court said that "the events on which the interstate and intrastate taxes are imposed must be 'substantially equivalent'; that is, they must be sufficiently similar in substance to serve as mutually exclusive 'prox[ies]' for each other." (511 U.S. 93, __ [128 L.Ed.2d 13, 24, 114 S.Ct. 1345, 1352].) What the Department overlooks, however, is that the quoted statement had nothing to do with the high court's determination whether the fee in question was *discriminatory*; its discussion of that issue (pt. II of its opinion) ended several pages earlier. Instead, the quotation is from part III of its opinion, devoted to the wholly distinct issue of whether the fee, although discriminatory, was nevertheless *justified* on a legal basis. Oregon had sought to justify its higher fee on out-of-state waste primarily on the basis that it was a compensatory tax, and the high court simply listed the "substantially equivalent" requirement as one of the three elements of that doctrine. The court explained that the compensatory tax doctrine itself is "merely a specific way of *justifying* a facially discriminatory tax as achieving a legitimate local purpose that cannot be achieved through nondiscriminatory means. See *Chemical Waste, supra*, 504 U.S. at 346, n. 9 [119 L.Ed.2d at 134-135, 112 S.Ct. at 2016] (referring to the compensatory tax doctrine as a 'justif[ication]' for a facially discriminatory tax). Under that doctrine, a facially discriminatory tax that imposes on interstate commerce the rough equivalent of an identifiable and 'substantially similar' tax on intrastate commerce does not offend the negative Commerce Clause." (511 U.S. at p. __ [128 L.Ed.2d at p. 23, 114 S.Ct. at p. 1352], italics added.) Reviewing Oregon's contentions in that light, the court concluded that the fee could not be justified as a compensatory tax. (*Id.* at p. __ [128 L.Ed.2d at pp. 23-25, 114 S.Ct. at pp. 1352-1353].) As will appear (pt. 3, *post*), in the case at bar the Department does not contend that its facially discriminatory inspection fee can be justified as a compensatory tax.

In the absence of further guidance from the high court, we are reluctant to extend the "substantially similar" requirement beyond the tax context where it is most appropriate and to which the court has thus far limited it, or to depart from the high court's often reiterated test of commerce clause discrimination by reading the requirement into that test. Under this view of the federal precedents, the Department's contention is without merit.

In any event, even if we assume arguendo that the "substantially similar" requirement does apply to regulatory fee cases, when that requirement is

properly understood it appears satisfied on the undisputed facts before us. Although the high court has not articulated a test for determining when events are "substantially similar" for commerce clause comparison, we may fairly infer from its tax decisions that the court deems such events are not "substantially similar" when they differ not just in degree but in kind. Thus in *Halliburton, supra,* 373 U.S. 64, 71 [10 L.Ed.2d 202, 207-208], the court held that an out-of-state manufacturer-user and an in-state retailer are not "similarly situated." In *Maryland* v. *Louisiana* (1981) 451 U.S. 725, 758-759 [68 L.Ed.2d 576, 602-603, 101 S.Ct. 2114], the court held that the "first use" inside a state of natural gas piped in from outside the state and the "severance" of natural gas produced from wells in the state are not " 'substantially equivalent events." In *Armco Inc.* v. *Hardesty, supra,* 467 U.S. 638, 642-643 [81 L.Ed.2d 540, 545], the court held that manufacturing and wholesaling— even, presumably, of the same products—are not " 'substantially equivalent events.' " (Accord, *Tyler Pipe Industries* v. *Dept. of Revenue* (1987) 483 U.S. 232, 242-244 [97 L.Ed.2d 199, 210-212, 107 S.Ct. 2810] [same].) In *Oregon Waste, supra,* 511 U.S. 93, __ [128 L.Ed.2d 13, 24-25, 114 S.Ct. 1345, 1353], the court held that the earning of income subject to general taxation and the disposal of waste subject to a special regulatory surcharge are not "substantially equivalent events."

In the case at bar we are called on to compare inspections of agricultural produce entering California (1) by ship from foreign countries and (2) by truck from other states. The Department contends these inspections are substantially dissimilar in three respects, but none is persuasive.

First, the Department states "The inspections seek different pests," but fails to explain the relevance of the point. Even if the pest species are different, it does not follow that the *inspections* to find them are substantially dissimilar—or at least any more dissimilar than inspections to find two different domestic pests (e.g., a fungus and a fly). More important, even if the different nature of foreign pests also means they are more difficult to find, that difference would be simply a matter of degree. It is true that such a difference could result in higher inspection costs; as will appear, however, higher costs are not relevant to the issue of facial discrimination but to the issue of justification.

Second, the Department states "Foreign pests are much more dangerous than domestic pests," but again fails to explain the relevance of the point. While the added danger of foreign pests may mean it is more important to find them, it does not follow that it is more difficult to do so. And even if it did, the difference would again be simply a matter of degree and at most

result in higher inspection costs irrelevant to the issue of discrimination. The Department notes that in *Chemical Waste, supra*, 504 U.S. 334, 343-344 [119 L.Ed.2d 121, 133-134], the high court emphasized a finding to the effect that " 'there is absolutely no evidence before this Court that waste generated outside Alabama is more dangerous than waste generated in Alabama.' " The reliance is misplaced: the high court quoted this finding in its discussion of the issue of justification, not the issue of discrimination. (See also *Oregon Waste, supra*, 511 U.S. 93, __ [128 L.Ed.2d 13, 22-23, 114 S.Ct. 1345, 1351] [noting the absence of "any safety or health reason unique to nonhazardous waste from other States" in its discussion of justification]; *Maine* v. *Taylor* (1986) 477 U.S. 131, 140-152 [91 L.Ed.2d 110, 122-130, 106 S.Ct. 2440] [holding that facially discriminatory ban on importing out-of-state baitfish was *justified* by danger to state's native fisheries].)

Third, the Department states that "Truck inspections take significantly less time, effort and expenditure to complete." Here the relevance of the point is plain but insufficient. On its face such a difference in inspection costs is a matter of degree; and like the higher costs that could flow from the first two distinctions proposed by the Department, such a differential would bear on justification rather than on discrimination. For example, in *Oregon Waste* the high court observed that Oregon could have claimed as a ground of *justification*—although it did not—that "the disposal of waste from other States imposes higher costs on Oregon and its political subdivisions than the disposal of in-state waste." (511 U.S. 93, __ [128 L.Ed.2d 13, 22, 114 S.Ct. 1345, 1351], fn. omitted.) In a footnote at this point the high court explained that "if out-of-state waste did impose higher costs on Oregon than in-state waste, Oregon could recover the increased cost through a differential charge on out-of-state waste . . . ." (*Id.* at p. __, fn. 5 [128 L.Ed.2d at p. 22, 114 S.Ct. at p. 1351].) Thus the court said only that higher costs could have justified the discrimination it had previously found on the face of the statutes; it pointedly did *not* say that higher costs would have meant there was no discrimination in the first place because the burdened events were not "substantially similar."

In the case at bar the Department's programs to inspect ships in foreign commerce and trucks in domestic interstate commerce are programs that may differ in detail or degree but do not differ in kind or purpose: both are inspections of agricultural produce in search of harmful pests as that produce arrives at California's borders, and both are designed to prevent such pests from entering this state and damaging its agricultural industry. They may therefore be seen as "substantially equivalent events" for commerce clause purposes, and we may compare them in determining whether the fee structure imposed on such inspections by the challenged statutes and regulation is

discriminatory. After making that comparison we hold, under the controlling decisions of the United States Supreme Court discussed above, that the provisions facially discriminate against foreign commerce in violation of the negative aspect of the foreign commerce clause of the United States Constitution.

### 3. The Issue of Justification

■ A state statute that discriminates against a federally protected class of commerce "is virtually *per se* invalid." (*Oregon Waste, supra*, 511 U.S. 93, ___ [128 L.Ed.2d 13, 21, 114 S.Ct. 1345, 1350].) Such a statute must be declared unconstitutional unless the state can justify the discrimination by showing that it " 'advances a legitimate local purpose that cannot be adequately served by reasonable nondiscriminatory alternatives.' " (*Id.* at p. ___ [128 L.Ed.2d at p. 22, 114 S.Ct. at p. 1351].) The high court has repeatedly emphasized just how exacting this burden is: "Our cases require that justifications for discriminatory restrictions on commerce pass the 'strictest scrutiny.' [Citation.] The State's burden of justification is so heavy that 'facial discrimination by itself may be a fatal defect.' [Citations.]" (*Ibid.*; accord, *Chemical Waste, supra*, 504 U.S. 334, 342 [119 L.Ed.2d 121, 132] [statutes discriminating against protected commerce are "typically struck down without further inquiry"]; *Associated Industries of Missouri* v. *Lohman, supra*, 511 U.S. 641, ___ [128 L.Ed.2d 639, 645-647, 114 S.Ct. 1815, 1820]; *Hughes* v. *Oklahoma, supra*, 441 U.S. 322, 337 [60 L.Ed.2d 250, 262-263]; *Philadelphia* v. *New Jersey* (1978) 437 U.S. 617, 624 [57 L.Ed.2d 475, 481-482, 98 S.Ct. 2531].)[13]

■ The Department contends that the challenged provisions advance a legitimate local purpose, to wit, that they support a program of inspecting foreign marine commerce in order to prevent harmful pests from entering California from other countries and damaging the state's agricultural industry. We do not doubt this is a legitimate local purpose.

This conclusion, however, is only the beginning of our inquiry. Pacific Merchant does not contend, nor has it ever contended, that California's overall agricultural inspection program unduly burdens foreign marine commerce, or any other class of commerce for that matter. Instead, Pacific Merchant contends only that the Legislature's decision to impose an inspection fee on foreign marine commerce but to provide free inspections for

---

[13]Contrary to the Department's assertion, the "virtually *per se* rule of invalidity" does not "hold only rhetorical value." Indeed, one federal district court recently stated that *Maine* v. *Taylor, supra*, 477 U.S. 131, is "the *only* case to date that this Court has found where the Supreme Court upheld a facially discriminatory regulation under the negative Commerce Clause." (*Clajon Production Corp.* v. *Petera* (D.Wyo. 1994) 854 F. Supp. 843, 859, fn. 30, italics added.) Our own research leads us to the same remarkable conclusion.

domestic interstate commerce at state taxpayer expense unconstitutionally discriminates against foreign commerce. It is solely the constitutionality of that fee structure that we consider here. As will appear, we shall conclude that the Department's proffered justifications for its discriminatory fee structure cannot withstand the exacting demands of "strictest scrutiny."

The weakness of the Department's position is foreshadowed by its preliminary contention that charging a fee for inspecting foreign commerce serves what it describes as "the 'pay-as-you-play' principle," i.e., that "those who are subject to a regulation should pay for it to be implemented." We agree with the well-established notion that every class of commerce is obliged to " 'pay its own way' " (*Complete Auto Transit, Inc.* v. *Brady* (1977) 430 U.S. 274, 281 [51 L.Ed.2d 326, 332, 97 S.Ct. 1076]), and that "It was not the purpose of the commerce clause to relieve those engaged in interstate [or foreign] commerce from their just share of the state tax [or regulatory] burden." (*Western Live Stock* v. *Bureau of Revenue* (1938) 303 U.S. 250, 254 [82 L.Ed. 823, 827, 58 S.Ct. 546, 115 A.L.R. 944].) However, the Department's funding mechanism itself violates this principle. Carriers in foreign commerce pay at least their fair share of the expense that the Department incurs for the inspection of that commerce: for example, during the 1992-1993 fiscal year carriers in foreign marine and air commerce paid an aggregate of $4.3 million in inspection fees, yet the Department used only $2.4 million of the amount to support those inspections. In stark contrast, carriers in domestic interstate commerce pay no such fees at all, even though Department incurs substantial costs to inspect them. In the words of the Department's own figure of speech, both foreign and domestic interstate commerce "play" but only foreign commerce "pays."

The Department next reiterates its point that inspections of foreign marine commerce seek different and more dangerous pests and are more time-consuming than inspections of domestic interstate commerce by truck. As we observed in discussing the same point earlier, these distinctions could well result in higher inspection costs for foreign commerce, and the United States Supreme Court has acknowledged that a state could justifiably "recover the increased cost through a differential charge" on the disfavored class of commerce. (*Oregon Waste, supra,* 511 U.S. 93, __, fn. 5 [128 L.Ed.2d 13, 22, 114 S.Ct. 1345, 1351].) But the high court's reasoning presumes that the favored class of commerce will at least pay its own share of the costs, so that the disfavored class will be burdened only by the "differential," i.e., the amount by which the latter exceeds the former. Here the Department does not claim that the cost of domestic interstate commerce inspections is zero: on the contrary, it is undisputed that the Department has

established 16 state-run border checkpoints and hired some 126 state inspectors to staff them, at an annual cost in 1992 of approximately $8.4 million. It is also undisputed, however, that domestic interstate commerce pays no part of that cost—the entire burden is borne by California taxpayers through the general fund.

We are thus not faced with a legislative decision to charge a lower fee for less expensive domestic interstate inspections and a higher fee for more expensive foreign marine inspections. Rather, the Legislature has selected a particular class of commerce—domestic interstate commerce—and provided routine inspections of that commerce free of charge, despite the fact that each such inspection costs California taxpayers money, but has determined that carriers engaged in another class of commerce—foreign marine commerce—should themselves bear the full state expense of such inspections. In short, the Legislature has not merely fixed agricultural inspection fees according to the average cost of each particular type of inspection; it has decreed that one class of commerce should receive free inspections and another should not. In these circumstances the difference in costs between the two types of inspections cannot justify the discrimination against the disfavored class.

For the same reason, the discriminatory fee on foreign marine commerce cannot be justified as a compensatory tax. To prevail on a claim that a facially discriminatory fee is justified on that basis the state must first prove that the favored commerce is subject to a specific, identifiable state tax burden to which the unfavored commerce is not subjected and for which the discriminatory fee is designed to compensate. (*Oregon Waste, supra,* 511 U.S. 93, __ [128 L.Ed.2d 13, 23-24, 114 S.Ct. 1345, 1352].) Here the Department does not and cannot contend there is any California tax that carriers of agricultural goods in domestic interstate commerce pay but that carriers of such goods in foreign commerce do not pay and for which the inspection fee on foreign commerce is designed to compensate.

Finally, the Department contends that two potential alternatives to its discriminatory fee structure would not be adequate to serve its purpose—or at least that there is a triable issue of fact as to whether such alternatives would be adequate or not. The proposed alternatives are (1) to remove the inspection fee on foreign commerce or (2) to impose such a fee on domestic interstate commerce. The Department's contention is not persuasive.

With respect to the first alternative, the Department asserts only—quoting from a 1992 affidavit by one of its officials—that without the fees it collects

from carriers in foreign commerce the state "has no funding available" to pay for such inspections. Viewed under the exacting standard of "strictest scrutiny," this evidence does not raise a triable issue of fact as to whether the Department's foreign marine inspection program could not be funded without the revenues generated by such fees. It is as true today as in 1992 that the State of California faces challenging economic times. But it would be unreasonable to conclude that if the Legislature could not levy foreign marine inspection fees it would decline to fund the program in another, constitutionally legitimate way.

The Legislature manifestly views the threat posed by nonnative agricultural pests as serious: as we have seen, in response to this threat the Legislature has for many years funded the Department's multimillion-dollar interstate border inspection program out of the general fund. In addition, as noted at the outset, the Legislature adopted the Act now before us as urgency legislation because it believed that "It is necessary to enact programs that are alternatives to the repeated application of pesticides in order to eradicate pests," and that the Act would produce "one such alternative" to help in its effort to "protect the people and the environment from the repeated application of pesticides" and "protect California's agriculture from pests." (Stats. 1990, ch. 1612, § 8, p. 7755.) If, as the Department urges, the Act has indeed furthered these legislative goals, it is reasonable to conclude the Legislature will devise an alternate, constitutionally permissible funding mechanism to support the continued inspection of foreign marine commerce.[14]

The Department advances four arguments against the alternative of imposing an inspection fee on domestic interstate commerce entering California by truck, but none is meritorious. First, the Department asserts that it

---

[14]The fact that the Department has recently reduced its marine terminal and airport inspection fees by half further undermines its position. As noted above, the Department explained in its public notice of amendment that "The Secretary [of the Department] has determined that an effective inspection program can now be conducted with revenues from the lower charge and user fee rates because the USDA is starting to provide inspections of international carriers at an adequate level. The USDA is now committed to supporting federal inspectors who previously had been funded by state contract." The Department's own explanation suggests that the USDA, in apparent recognition of the concerns of the Department and others regarding the adequacy of its existing foreign inspection program, has obtained additional funding to increase the number of federal inspectors it employs and has used this additional funding to improve the overall quality of its program. Although the Department will continue to engage in "oversight and coordination with the USDA on inspections of international carriers, investigations of smuggling, and intensification of public awareness and education efforts," by its own admission the modified program will cost much less to operate. Because the amount of funding needed has thus been substantially reduced, it is reasonable to infer that the Legislature will be even more likely to fund the program from another, constitutionally legitimate source.

would be difficult to calculate the proper amount of such a fee. It fails to explain, however, why the Legislature and the Department would have any more difficulty in setting the amount of an inspection fee on domestic interstate commerce than they had in setting the amount of the fee on foreign marine commerce now before us. Second, the Department contends that to collect such a fee for each truck would complicate the operation of its border inspection stations and might slow the flow of traffic. But the Department fails to explain why it could not palliate any such effects by administrative means, and in any event we must decline to place administrative convenience before constitutional legitimacy. Third, the Department claims "there is a chance" that imposing such a fee might cause an increase in the number of trucks that evade inspection. Speculation about a possible illegal response, of course, cannot justify an actual unconstitutional discrimination. Lastly, the Department asserts "there is a possibility" that imposing such a fee on carriers in domestic interstate commerce might cause them to complain that no fee is imposed on carriers in intrastate commerce. Again this is mere speculation, and hypothesizes a funding mechanism that the Department may or may not be able to justify under federal constitutional law if such a challenge ever materializes.

It follows that the Department has failed to bear its heavy burden, under the controlling decisions of the United States Supreme Court discussed above, of justifying its discriminatory fee structure by showing that its purpose " 'cannot be adequately served by reasonable nondiscriminatory alternatives.' " (*Oregon Waste, supra,* 511 U.S. 93, __ [128 L.Ed.2d 13, 22, 114 S.Ct. 1345, 1351].)

We do not retreat from the rule that a motion for summary judgment should not be granted if there is a triable issue of material fact. (Code Civ. Proc., § 437c, subd. (c).) But as we have seen, in the case at bar none of the Department's proffered justifications raises such an issue; rather, each is insufficient on its face. Nor is this unusual: in the vast majority of reported decisions reviewing state statutes held to discriminate against foreign or domestic interstate commerce, the federal courts have rejected the state's proffered justifications as a matter of law. (See, e.g., *Oregon Waste, supra,* 511 U.S. 93, __ [128 L.Ed.2d 13, 22-26, 114 S.Ct. 1345, 1351-1354]; *Chemical Waste, supra,* 504 U.S. 334, 342-348 [119 L.Ed.2d 121, 132-133; *New Energy Co. of Indiana* v. *Limbach* (1988) 486 U.S. 269, 278-280 [100 L.Ed.2d 302, 311-312, 108 S.Ct. 1803]; *Bacchus Imports, Ltd.* v. *Dias, supra,* 468 U.S. 263, 270-273 [82 L.Ed.2d 200, 208-211]; *Hughes* v. *Oklahoma, supra,* 441 U.S. 322, 337-338 [60 L.Ed.2d 250, 262-263]; *National Meat*

*Ass'n* v. *Deukmejian, supra,* 743 F.2d 656, 661-663; *Cranberry Hill Corp.* v. *Shaffer* (N.D.N.Y. 1986) 629 F.Supp. 628, 634-635.)[15]

The Department has had ample and repeated opportunities—in the trial court, the Court of Appeal, and this court—to propose justifications that cannot be held insufficient as a matter of law, but it has been unable to do so; we see no reason to believe that on a further hearing it would succeed where it has heretofore consistently failed. The trial court correctly granted summary judgment to Pacific Merchant on the ground that the challenged provisions unjustifiably discriminate on their face against foreign commerce.[16] It is time to end this litigation and allow the Legislature to address the matter if it be so advised.

The judgment of the Court of Appeal is reversed.

Lucas, C. J., Kennard, J., Arabian, J., Baxter, J., George, J., and Werdegar, J., concurred.

---

[15]Indeed, the United States Supreme Court has itself granted a motion for summary judgment in such a case. (*Wyoming* v. *Oklahoma, supra,* 502 U.S. 437.) There Wyoming, a major coal-producing state, challenged as a violation of the commerce clause an Oklahoma statute requiring that at least 10 percent of the coal used by Oklahoma electric utilities be mined in Oklahoma. The high court held that the statute was discriminatory on its face (*id.* at pp. 455-456 [117 L.Ed.2d at pp. 16-17]) and that Oklahoma's proffered justifications were insufficient as a matter of law (*id.* at pp. 456-459 [117 L.Ed.2d at pp. 23-26]). Exercising its original jurisdiction, the high court then decreed summary relief: "We deny Oklahoma's motion for summary judgment and grant that of Wyoming." (*Id.* at p. 461 [117 L.Ed.2d at p. 27].)

[16]In light of this conclusion we need not reach the additional issue whether the amount of the challenged inspection fee is excessive.